This is a suit for damages growing out of an accident which occurred on Highway 90 on the morning of September 9, 1944, at a point 5 or 6 miles east of Houma. In the accident Philogene J. Engeron sustained injuries from which he died on September 11, 1911.
The suit is brought by Mrs. Agnes Boutte Engeron, his widow, acting individually and on behalf of her minor daughter, Betty Joyce Engeron, and is directed against Nelson LeBlanc, the driver of one of the trucks involved in the accident; LeBlanc's employer, Bertoul Cheramie, doing business in the name of Morgan City Packing Co., and the Pennsylvania Casualty Co., of Philadelphia, Pennsylvania, the public liability insurer of the Cheramie truck. The total demand made by the widow on her behalf is the sum of $24,383.53, and on behalf of her minor child, $29,588.53.
Negligence against LeBlanc is predicated in plaintiff's petition on the fact that he had been following the truck in which the deceased was riding at a distance far enough for him to be able to control and stop his truck in view of the circumstances under which the lead truck had gradually slowed down so that Engeron could alight as it approached another truck that was disabled and parked on the opposite side of the highway, and to which assistance was going to be rendered. That the excessive speed at which LeBlanc was operating his truck, his failure to observe the situation which confronted him and which had the effect of blocking the road, making it impossible for him to pass on the left, amounted to such negligence as was bound to and did cause the accident. On alighting from the truck in which he was riding, Engeron stepped onto the shoulder of the highway to his right. LeBlanc, then driving so fast that he was not able to stop, and at the same time being unable to pass on his left, drove onto the shoulder on his right and ran into Engeron causing him to sustain the injuries from which he died two days later. It is alleged in the petition that the driver of the truck in which Engeron was riding slowed *Page 499 
down gradually and that the driver gave the customary signal showing that he was slowing down or was going to stop by exposing his left hand from the left side of the truck in order to warn traffic in the rear of him of what he intended to do.
Exceptions of vagueness were filed on behalf of the defendants whereupon plaintiff filed a supplemental petition setting out the facts called for by the exceptions. An exception of no cause of action was then filed and upon this being overruled the defendants filed answers in which the negligence charged against LeBlanc is generally denied and in the alternative contributory negligence on the part of Engeron is pleaded. The defendant Pennsylvania Casualty Co., in addition, pleaded that its liability under the insurance policy it carried on the Cheramie truck was limited to $10,000 and in no event could a judgment for a greater sum be awarded plaintiff against it.
After trial in the court below there was judgment in favor of the defendants rejecting the plaintiff's demands and dismissing her suit, whereupon this appeal was taken. The trial judge did not assign written reasons and the only indication we find in the record as to what he based his judgment on is from the brief of counsel for plaintiff who states that in his oral reasons the district judge held that the deceased, by his own contributory negligence, had barred her recovery.
There isn't much dispute regarding the facts in this case. Indeed save in a few minor respects, we might say that there is no dispute whatever. As we view them however, we are forced to disagree with the trial judge. Assuming that he did base his judgment on the contributory negligence of the decedent he must have held that the driver of the Cheramie truck was also negligent. Of this, there can hardly be any doubt and the real issue in the case is whether Engeron, by any negligence on his part, contributed in any way to the accident which caused his death.
On the morning of the accident Engeron was driving another of his trucks from New Orleans in the direction of Houma. This truck carried a heavy load of oysters. On reaching the point of the accident his truck became disabled by having a flat tire. We gather from the testimony that he had a set of dual tires but on account of the weight of the load he had he did not deem it safe to continue with a single tire. We may be wrong in this but the fact remains that he found it necessary to stop his truck and either go or send to Houma for another of his trucks to render assistance to the disabled truck. Plaintiff had alleged that he parked this truck with the right wheels on the shoulder of the road but the testimony shows that the truck was parked entirely on the paved slab. In our opinion that is not important as no matter where it was parked it had the effect of blocking the pavement as the other truck approached it from the west.
Engeron succeeded in contacting one of his men, James Pitre, in Houma, who drove another of his trucks from Houma in the direction of the place at which the disabled truck was parked. He picked up Engeron at some place on the highway from where he had telephoned, and their intention, according to Pitre's testimony, was to proceed to the place where the disabled truck was parked, to pass by it, go forward on the north side of the pavement a little beyond that truck and then back close up to the rear of it in order to unload it and lighten it to the extent where it might be driven into Houma in the condition in which it was. This intention they were carrying out, proceeding along the highway at a rate of speed not exceeding 30 to 35 miles an hour. In the meantime the Cheramie truck had been following them at a considerable distance. The preponderance of the testimony leaves no doubt that the lead truck slowed down as it approached the parked truck. There arises some dispute, from LeBlanc's testimony, on the point whether Pitre, the driver of the lead truck, gave any signal with his hand that he intended either to slow down or to stop entirely. Pitre testified positively that he did and LeBlanc's testimony is to the effect that if he did he did not see the signal. At the time that the lead truck began to gradually slow down LeBlanc was anywhere from 200 to 400 feet back of it. The preponderance of the testimony on this point is that he was more than 200 feet and in fact he himself would not deny that he may *Page 500 
have been as far as 400 feet, when he had, or should have had a clear vision of the parked truck and of the other truck slowing down near it. This should have given him some indication that the truck ahead of him was going to have something to do with the parked truck, and that the road ahead of him would be momentarily blocked.
Notwithstanding all of this LeBlanc kept coming on at the same rate of speed he had been going, which he admits was as much as 35 miles an hour, and he states that it was not until he had reached a point about 17 feet from the truck ahead of him that he realized that the road would be blocked and that he could not make it to his left of the highway.
In the meantime Engeron who was riding on the right hand side of the lead truck prepared to alight from that truck onto the shoulder of the road in order, we presume, to let the LeBlanc truck which he saw coming, pass on, and then he would cross over to the disabled truck and give what assistance was to be rendered. As he alighted onto the shoulder, LeBlanc who apparently saw what was going to happen if he stayed on the paved slab of the highway, pulled his truck onto the shoulder on his right and as he did so Engeron who found himself confronted with the danger before him, started to run across the shoulder but before he could do so the LeBlanc truck ran into him and caused the injuries from which he died.
[1-3] In our opinion LeBlanc was clearly negligent in following the lead truck at the speed he was going without ever apparently realizing the situation on the highway which was going to block his path. Let us assume, that he was 200 feet back of the lead truck when that truck began to slow down, there is no reason at all, had he been attentive, why in that distance he could not have perceived what was going on and bring his truck under such control that he could stop it and avoid an accident which inevitably was going to happen otherwise. In failing to realize this until he was 17 feet from that truck, as he says, he was negligent in not having seen and observed what he should have seen and observed in proper time. It is now urged on his behalf that he did the only thing that he could do under the circumstances, which was to pull his truck over to the right and try to pass ahead on the shoulder. He is sought to be relieved from negligence on the ground that there was an emergency ahead of him and if his choice in trying to avoid the emergency was not the wisest one to make, he should not be held liable for what followed as a result. Conceding that there was an emergency which presented itself in front of him the rule under which he seeks to be relieved of responsibility could not apply in this case because he had a part himself, if not the major part, in creating that emergency. It has frequently been held that one who seeks to be relieved from negligence on the emergency rule will not succeed when it is shown that he himself took some part in creating the emergency. See McCook v. Rebecca-Fabacher, Inc., La. App.,10 So.2d 512, and authorities cited.
[4] Convinced as we are of LeBlanc's negligence, the next point to be considered is whether Engeron himself was guilty of such negligence as would bar recovery in this accident which resulted in his death. It is claimed by the defendants that he was in a position to see the Cheramie truck following him because he was standing on the running board of the truck in which he was riding preparing to alight and that when he alighted under such conditions, he was guilty of negligence. Some argument is made on the point that he did not alight immediately on the shoulder but that he stepped onto the paved slab of the highway and the inference is, that had he remained there the LeBlanc truck could have successfully passed on ahead of him on the shoulder which it had taken. The evidence is by no means positive that he stepped on the pavement but if he did it was so close to the shoulder that that would not have made any difference. It is true he stepped from a moving vehicle but its movement at the time was so slow that the situation called for the truck in the back of it either to come to a stop or to proceed at as slow a rate of speed as the lead truck was going. We do not believe that a person in the position that Engeron was could be held to anticipate that a truck following the truck from which he was alighting was going to *Page 501 
veer to its right and try to pass ahead on the shoulder of the highway. We rather believe that Engeron, in stepping from the highway to the shoulder, was trying to put himself in a position of safety and certainly he had no reason to believe that a truck following him, would drive onto the shoulder on its right hand side of the road and run over him.
But, it is said further that even then he was negligent because when he saw the truck coming towards him, instead of remaining stationary he ran across the shoulder and was not struck by the truck until it had pulled over to the embankment on its right and actually turned over after it struck him. There however, assuming that this is what happened, we would have a situation which called for the application of the emergency doctrine. Engeron was the one who was then confronted with an emergency which had suddenly been created by the presence of that truck driving on the shoulder of the highway to the right. He was in close quarters and probably figured that his safest means of escape was to run across the shoulder, down the embankment. Under the circumstances, even if that was not the safest thing for him to do, that was perhaps what a reasonable individual would have done and we do not think that he should be held negligent for having tried to save himself in that manner.
The facts in this case are unusual and we find none of the cases cited by counsel on both sides, with most of which we are familiar, to be directly apposite. In some of its features, the case of Zuvich v. Ballay et al., La. App., 149 So. 281, comes closer to being in point than any on the question of contributory negligence as pleaded against the deceased.
The only other legal point involved is with reference to the duty of the drivers of two vehicles on the highway driving in the same direction. Generally speaking the greater duty is on the driver of the vehicle which is trailing and in view of the situation which presented itself to the trailing vehicle in this case, we definitely are of the opinion that the driver had the greater duty of care imposed upon him. Had he had his truck under proper control, as it was his duty to have, especially when he saw or should have seen that the road ahead of him was going to be blocked, there is no doubt that he could have stopped it in time or even brought it to such a slow speed as to trail the truck ahead of him until it would have pulled over to the left of the highway and no accident would have happened. His negligence, in our opinion, was the proximate cause of the accident and we therefore conclude that he, his employer and the insurance carrier of the truck should be held liable.
[5] The claim for actual damages amounting to the sum of $983.53 has been satisfactorily proven. The largest item was for funeral expenses and this is shown to have been charged to the community, on the Tableau of Distribution in the succession of the deceased, against the widow and she should therefore recover that amount.
The other damages to both the widow and the child are for the pain and suffering which the deceased endured from the time of the accident until his death on the following Monday afternoon and for the loss of love and companionship brought about by his death, and also for loss of support.
[6] The widow had claimed large sums for loss of affection and loss of support. However, at the end of the trial, her counsel entered into a stipulation that she and her husband had been estranged and had been living apart for at least five years prior to the date of his death. The stipulation recites that Engeron was on "moderately friendly terms" with his wife and contributed approximately $75 a month to her support. Under the circumstances we think her recovery should be limited to the extent of the loss of what contributions he made toward supporting her and this we will fix at the sum of $2,000.
[7] In assessing damages in favor of the minor, Betty Joyce Engeron, we have a different situation because judging from her own testimony she seemed to have been very much devoted and attached to her father as he was also to her. She lived with him and must have been a great source of comfort to him in view of the strained relation *Page 502 
between himself and her mother. Besides, she seemed to take an interest in his business and was of some help to him during her spare time from her duties at school. Whilst we would not say that he was lavish towards her, he certainly seemed to give her all that could reasonably be desired from a father of his means and circumstances. Moreover, he certainly had planned to have her complete her education at some college or university after she had graduated from high school.
She visited her father in the hospital and was a witness to the agony he must have gone through, realizing how seriously hurt he was, and that apparently there was no hope for his recovery. His condition of consciousness lasted from Saturday morning when he was injured until Sunday afternoon when he drifted into a state of coma. She has inherited for his pain and suffering during that time. What the amount should be is rather difficult to fix but we can estimate it at about $1,000. For the loss of the love and affection of her father and the comfort that he was to her, in addition to what he contributed to her wants and would have contributed further also to her education, she is entitled to quite a substantial amount. This, we fix at the sum of $7,000, making a total award of $8,000 in her behalf.
Judgment will accordingly be rendered in favor of the plaintiff and against the defendants, in solido, for the total amount of $10,983.53, limiting the liability of the defendant, Pennsylvania Casualty Company of Philadelphia, Pennsylvania, to the sum of $10,000 as provided in the policy of insurance carried by it.
For the reasons stated, it is ordered that the judgment appealed from be, and the same is hereby reversed, annulled and set aside, and it is further ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, Mrs. Agnes Boutte Engeron, individually, and as natural tutrix of her minor child, Betty Joyce Engeron, and against the defendants, Nelson LeBlanc, Bertoul Cheramie, doing business in the name of Morgan City Packing Company, and Pennsylvania Casualty Company of Philadelphia, Pennsylvania, jointly and in solido, as follows, to wit:
In favor of the plaintiff, Mrs. Agnes Boutte Engeron, individually, in the sum of $2,983.53, and in favor of the said Mrs. Agnes Boutte Engeron for and in behalf of and as natural tutrix of her minor child, Betty Joyce Engeron, in the sum of $8,000 with legal interest from date of judicial demand until paid on the total amount of both sums, together with all costs of these proceedings.
It is further ordered that the liability of the defendant, Pennsylvania Casualty Company of Philadelphia, Pennsylvania be limited to the sum of $10,000.