87 So.2d 187 (1956)
Charles E. DICKSON, Plaintiff-Appellee,
v.
Mrs. Estella Fonville PETERS et al., Defendants-Appellants, Maryland Casualty Company, Intervenor.
No. 8487.
Court of Appeal of Louisiana, Second Circuit.
April 19, 1956.
Rehearing Denied May 21, 1956.
Writ of Certiorari Denied June 29, 1956.
*189 Thomas W. Davenport, Monroe, for appellants.
H. B. Gist, Jr., Alexandria, for intervenor.
*190 Julian E. Bailes, G. F. Thomas, Jr., Natchitoches, for appellee.
W. Peyton Cunningham, Natchitoches, for Cason and Travelers Ins. Co.
AYRES, Judge.
Plaintiff instituted this action in tort for personal injuries, permanent disability and for physical and mental pain suffered and sustained by him, as well as for hospital and medical expense and for loss of earnings, as the result of an accident occurring about 5:30 P.M. June 8, 1954, at Monette's Ferry, Natchitoches Parish, Louisiana, on State Highway No. 20.
Plaintiff was an employee of the Department of Highways of the State of Louisiana as a laborer in connection with the building, maintenance and repair of bridges, performing services in connection with his employment in assisting in hauling bridge materials from Alexandria to Natchitoches on an International truck and trailer combination.
Made defendants were Larris D. Cason, driver of the aforesaid vehicle of the Department of Highways, in which plaintiff was riding as a passenger; Travelers Insurance Company, the public liability insurance carrier of the Department of Highways; Mrs. Estella Fonville Peters, owner of a Cadillac automobile alleged to have been involved in the accident; David Frazier, colored chauffeur of Mrs. Peters, driver of the Cadillac at the time of the accident, and Zurich General Accident & Liability Insurance Company, the public liability insurance carrier of Mrs. Peters.
Maryland Casualty Company, compensation insurance carrier for plaintiff's employer, intervened for the purpose of recovering workmen's compensation paid to plaintiff as a result of injury sustained by him in said accident, together with $1,000 medical expenses expended by it for his treatment.
On the sustaining of an exception of no cause or right of action filed by the Travelers Insurance Company, based on the contention that coverage under its policy was not afforded to employees of the insured where compensation was payable, that concern was dismissed as one of the parties defendant. No appeal was perfected from such dismissal.
After trial before a jury, a verdict of $20,000 was rendered in plaintiff's favor against the remaining defendants, and, pursuant to such verdict, they were condemned in solido for such amount, with interest and costs.
By virtue of a stipulation, the judgment provided that from the aforesaid award to plaintiff the intervenor, Maryland Casualty Company, was to be paid the sum of $3,250, representing 75 weeks of compensation and the statutory limit of medical expenses in the amount of $1,000, together with such additional compensation as may be paid by intervenor to plaintiff subsequent to November 16, 1955.
From the judgment thus rendered and signed, the defendants, Mrs. Estella Fonville Peters, David Frazier, and Zurich General Accident & Liability Insurance company, Ltd., appealed suspensively and devolutively to this court. They shall be generally referred to hereinafter as the defendants. Although orders of appeal were entered for and on behalf of defendant Cason and the intervenor, Maryland Casualty Company, neither of said appeals has been perfected. Plaintiff has answered the appeal, praying that the award be increased to $34,325.
The trial consumed two days and the record consists of three volumes, including 245 pages of evidence, as well as various pictures and aerial photographs of the area, but no plat or survey of the scene or measurements of distances, and we have been favored by most exhaustive and detailed briefs consisting of 156 pages, supplemented by oral arguments.
The locale of the accident may be described as follows: The highway is approximately 20 feet in width, runs approximately north and south, and, for several miles south of the scene of the accident, *191 traverses an area of hills and valleys, forming a serpentine course, until finally it descends down-grade a considerable distance to Cane River, which is crossed on a bridge commonly known as Monette's Ferry bridge, immediately north of which is a settlement or unincorporated village by the same name, consisting of two country stores, Pershing Lacaze Grocery, located some 50 or 60 feet from the east edge of the highway, and, on the west, Mahfouz's Grocery, situated approximately 40 feet from the west edge of the highway, both a few hundred feet north of the bridge. Several residences are located in the immediate vicinity. Paralleling Cane River and crossing Highway 20 at the north end of the bridge is a graveled highway. Running from the main highway, beginning near the Lacaze Grocery and proceeding in a southeasterly direction is a connecting link with the graveled highway. In between these highways and passageway is located a triangular grassy strip located across the graveled highway and to the right as one proceeds northward on Highway 20. From a point where the highway reaches the level terrain near the south end of the bridge, the highway is straight for a considerable distance to the north. There were no yellow stripes or caution marks on the highway at the point where the accident occurred.
Plaintiff contends that on the aforesaid date and occasion, while he was riding in the right-hand front seat of the cab of the International truck and trailer unit, traveling in a northerly direction and approaching the aforesaid Monette's Ferry bridge, the Cadillac automobile, owned by Mrs. Peters and driven at the time by her employee and chauffeur, David Frazier, approached from the rear, and, as said car started around the truck, several head of cattle were observed immediately adjacent to the highway north of the bridge, clearly visible to both drivers, nevertheless, Frazier, after passing the truck on the bridge, proceeded to immediately pull back into the right-hand, or east, traffic lane, in which said truck was traveling, applied his brakes and stopped the Cadillac in front of the approaching truck, thus creating an emergency confronting the driver of said truck, who, on the spur of the moment, swerved the truck and trailer sharply to his left to avoid crashing into the rear end of the Cadillac; that after thus driving into the left or west lane of said highway, the truck was confronted with an oncoming vehicle approaching from the north, which required Cason, the truck driver, to swerve the truck further to the left and onto the shoulder of the highway to prevent a headon collision, all of which caused him to lose control of the operation of said truck and trailer, which, due to the sloping of the shoulder and the unevenness and roughness of the terrain, overturned, scattering the timbers about the area and upon plaintiff and inflicting the injuries for which damages are sought.
Defendants contend that no passing movement was made by the Cadillac of the highway vehicle on or in the vicinity of the bridge but that such passing occurred some four or five miles south of that point; that the Cadillac had previously stopped in the vicinity of the scene of the accident to avoid cattle that had walked upon the highway. Whereupon, the driver, then, observing the approach from the north of a vehicle in its left or east lane of travel, drove the Cadillac to the shoulder of the road; subsequently, he observed the approach of the truck and trailer at an excessive rate of speed, out of control of the driver, and as a result of which and without any fault on the part of the driver of the Cadillac, the accident occurred.
Negligence proximately causing the accident was charged by plaintiff to both Cason and Frazier. Both were found guilty of the charges. The question of Cason's negligence is now foreclosed in the judgment, from which no appeal by him has been taken.
The question now presented for determination is whether Frazier, as the driver of the Cadillac, was guilty of negligence constituting a proximate cause of the accident or a proximate contributing cause. Specifically, Frazier was charged with negligence *192 in passing the truck and trailer unit upon a bridge and/or at a public road crossing and in a populated and congested area, and particularly, after making said passing maneuver, in immediately pulling back into the lane of traffic of the truck and there suddenly stopping his automobile, and, further, in driving at a speed in excess of the legal limits and in a dangerous and unreasonable manner under the circumstances then existing, when he saw or should have seen cattle on the shoulder of the road before and at the time he started and completed his passing movement, when he knew, or should have known, that the presence of the cattle on the shoulder of the road would likely present a dangerous situation and possibly require him to stop immediately in front of the vehicle he had just overtaken and was in a manner passing. Such negligence is alleged to have caused Cason to lose control of the International truck and trailer unit, resulting in its wreck and upset.
Defendants admit that Cason swerved the truck and trailer sharply to the left, losing control, and that said unit went off the west shoulder of the highway and overturned, but asserted that Cason's negligence was the sole proximate cause of the accident and denied any negligence on Frazier's part. In further answering, defendants alleged that David Frazier, on approaching Monette's Ferry and the bridge, maintained control over his vehicle, and while he noticed cattle approaching the highway just north of said bridge, he slowly reduced his speed to allow the fully visible cattle an opportunity to clear the said highway; that, after completing such movement and resuming speed to the north, he noticed that an approaching southbound vehicle was moving from its right or west lane of travel to the opposite lane occupied by the northbound Cadillac, and upon looking to the south Frazier then saw a truck and trailer coming from behind, instituting a passing movement of the Cadillac, and, realizing the peril of such movement, Frazier steered the Cadillac to the east shoulder of the highway, and the truck and trailer then swerved sharply to its left, or west, moving at a high, excessive and dangerous rate of speed, continued north past the said Cadillac in a swerving and rocking fashion and then went out of control and crashed in the ditch of the highway. Accordingly, it was alleged that the sole and proximate cause of the accident was the negligent, reckless and careless action on the part of the driver of the said truck and trailer; that David Frazier was free of negligence and that the said Cadillac was in no way involved in the accident.
Alternatively, defendants plead that plaintiff was guilty of independent negligence and of independent contributory negligence in riding in the truck without making any protest as to the manner in which Cason was operating the truck and trailer unit, which, in effect, was with his consent in the face of recognized danger.
We shall first consider the negligence charged to Frazier as the driver of the Cadillac. That the passing maneuver may have occurred on the bridge or at a public road crossing and in a populated and congested area is not shown to have had any connection with the occurrence of this accident. That such in themselves may have occurred is, therefore, of no material importance in establishing any negligence charged in this case. The principal charge of negligence upon which plaintiff relies for recovery is that Frazier, the driver of the Cadillac, saw and knew of the presence of the cattle near the highway at the time he began and completed his passing movement, and that, notwithstanding his knowledge of the presence of the truck immediately to his rear, he proceeded into the right lane of traffic and suddenly slowed down and stopped, presenting and confronting the driver of the truck with an emergency, in the avoidance of which and the crashing into the Cadillac the truck driver swerved the truck sharply to the left and took to the shoulder of the road, lost control and turned the truck over.
That the Cadillac passed the truck and trailer at, on or near the bridge and stopped *193 in front of the truck is vigorously disputed by defendants. It was contended that the passing was completed several miles south thereof. A resolution of this question requires a consideration of the testimony of the various witnesses. Both plaintiff and Cason testified that the Cadillac followed the truck several miles through the hills and around the curves and down-grade to the bridge, where it passed the truck, both agreeing that the Cadillac stopped suddenly in their lane of travel immediately in front of the truck, plaintiff testifying that it stopped 90 feet from the north end of the bridge. Plaintiff testified that he observed the Cadillac on several occasions as he would look back to determine whether the binders were holding the timbers properly. On several occasions, he saw the driver of the Cadillac making an effort to pass; Cason testified that, on one occasion, he saw Frazier make an effort to pass. Frazier testified that he passed the truck five or six miles south of the bridge.
H. Q. Bird, State Highway trooper, who investigated this accident shortly after its occurrence and before the cars were moved testified that Frazier told him that he started around the lumber truck as it neared the bridge and passed it on the bridge and that, as he passed the lumber truck, he noticed some cattle in the road and he pulled back into the right lane of traffic, ahead of the truck, and began to slow down and stop in order not to hit the cattle. A similar statement was made by Cason to the trooper at that time.
Mrs. Peters was asked:
"Q. As you came over the bridge, Mrs. Peters, which is shown in the photographs and as to which you have heard testimony here in the Courtroom, did you on, at or near the bridge, pass a heavily loaded State Highway truck?"
to which she answered:
"A. Yes, sir."
She was next asked:
"Q. Where was the state highway truck, if you recall, where it was at?"
to which she replied:
"A. Well, it was about four miles before we got to the bridge we passed it and we saw some cattle and we slowed down and passed over the bridge and then we came to * * * and then the boy came to a stop across the bridge." (Emphasis supplied.)
John T. Lewis and Johnny Edward Metcalf, the driver and one of the other occupants of the automobile traveling in a southerly direction towards the bridge and meeting the truck and trailer and Cadillac, were called as witnesses on behalf of the defendants. Lewis testified that he saw no passing movement on the bridge but admitted that the first time he noticed the Cadillac it was coming off the north end of the bridge. He was undecided as to whether the Cadillac came to a complete stop before it proceeded to the shoulder. He did, however, see the truck coming from behind the Cadillac and to its left and on to Lewis' lane of travel. It was then that Lewis took to his left lane of traffic and headed towards the Cadillac, which the driver then drove from the highway to the shoulder of the road. Metcalf's testimony is similar. He did not recall seeing the Cadillac until he heard noises as if made by a screeching of tires. When he first noticed the truck, he says there were some cows coming off the road and this automobile stopped and the truck was coming around it, but later he stated that "the automobile slowed real slow or stopped I don't remember which and the truck came on around it and the truck came over on our side of the road which was the west side of the road and we took over in the opposite lane", which was the lane of the Cadillac automobile.
Nancy Anne Stearns, a passenger in the Cadillac, was paying little attention to the driving but recalled that the first she knew about the accident was that the Cadillac *194 was stopped on the highway and the truck went by, which she watched until it turned over. She had no independent recollection of the Cadillac passing the truck.
Linda Trusty, aged 16, was also a passenger in the automobile. She did not recall the car passing any truck anywhere. She says that Frazier slowed the car and pulled off on the shoulder of the road, but didn't observe the truck until it was going off the side of the road.
Another witness, Miss Annie Whalen, also a passenger in the car, testified that the Cadillac drove to the shoulder of the road and stopped and it was in that position when the approach of the truck was observed. The truck continued on the shoulder until it got out of control and turned over. She says the truck was quite a piece back in the road when she first saw it.
We are convinced, from our study and comprehension of the evidence, that the Department of Highways truck, loaded with heavy timbers 3" × 10" × 20', was overtaken by the Cadillac some several miles south of the Monette's Ferry bridge; that on account of the course of the highway, over hills, through valleys and, particularly, around curves, the driver of the Cadillac found it impossible to safely pass until the bridge was reached; that the speed of neither car nor truck was excessive; that the speed on reaching the bridge was about 35 miles per hour for the Cadillac and 25 miles per hour for the truck; that near the south end of the bridge the Cadillac began its passing movement by occupying the west or left traffic lane; that near the midsection of the bridge the vehicles were alongside, and the passing movement was completed before or near the time the north end of the bridge was reached; that on, at least, one side of the highway, if not on both, were cattle visible to the drivers of both vehicles and most certainly to the driver of the Cadillac on its taking a position in the west lane of traffic, which afforded its driver possibly a better view of the area north of the bridge and east of the highway, which view was perhaps not so visible to Cason due to his position on the bridge and the existence of the bridge railings and timber growth adjacent to the bridge.
The testimony leaves no reasonable doubt in our minds but that the Cadillac slowed down and stopped after it pulled back into its right-hand lane in front of the approaching truck. Frazier, its driver, testified that a calf was ambling along in his lane of traffic and that he waited for it to clear his passage. This movement of the car, after just having passed the heavily loaded truck, created and presented to the driver of the truck an emergency solely of the making of the driver of the Cadillac, and at such time and within such a short distance in front of the approaching truck that Cason, its driver, scarcely had the time to suddenly and sharply maneuver the truck into the west line of traffic and avoid crashing into the rear of the automobile. When the truck was thus maneuvered into the west traffic lane, the driver realized the nearness of the approach of the Lewis car, whereupon, to prevent a head-on collision, he proceeded further to the west, or to his left, until he reached the shoulder of the highway. Due to the unevenness of the terrian and the sloping of the shoulder, he endeavored to proceed under power so as to maintain control of the truck and to eventually bring it back onto the highway. Unfortunately, he was unable to do so. We attribute the distance traveled by the truck after passing the Cadillac, in a large measure, to the efforts thus expended instead of to the speed at which, defendant would have us believe, the truck had been traveling. A further conclusion is that it was only when Lewis saw the truck coming from behind the Cadillac and into his lane of traffic and took to his left in the lane of traffic of the Cadillac that the Cadillac was driven to the shoulder of the road. When Frazier began his passing movement upon the bridge and during that course of operation and saw, or should have seen, the cattle near the highway, and, it being problematical as to what they would do, he should have foreseen that the passing undertaken at that instant would have constituted a dangerous maneuver. That circumstance actually followed when he was impelled to stop in front *195 of the truck he had just passed. There is no evidence in the record that Frazier gave any signal of his intention to slow down, stop or to turn off the highway, or that he took time to give such signal before stopping. Frazier's operation of the Cadillac constituted gross negligence and a proximate cause of the accident.
That it might be concluded in subsequently reviewing the situation that Cason could possibly have avoided the accident by pursuing another course, or taking other means, constitutes no defense under the facts and circumstances of this case. There is no certainty that the accident would have been thereby prevented. That is a matter of pure conjecture. However, when one in charge of the operation of a motor vehicle is confronted with a sudden emergency, not of his own creation, or one in which he took part or contributed to, he is not to be censored or condemned, if, in subsequently contemplating the situation, it could be said that he did not make the wisest choice of the alternatives available to him in his efforts to avoid the accident precipitated by the emergency. Marler v. State, La.App., 78 So.2d 26; Peltier v. Travelers Ins. Co., La.App., 49 So.2d 346; Home Ins. Co. v. Warren, La.App., 29 So.2d 551.
The authorities cited by defendants, Engeron v. LeBlanc, La.App., 29 So. 2d 497, and Prevost v. Smith, La.App., 197 So. 905, to the effect that where one is not free from fault himself or has some part in creating an emergency, he cannot successfully rely upon the sudden emergency rule in freeing him from liability, are inapplicable here. Plaintiff was not the operator of the truck. The operator was an experienced driver, over whom, or the operation of the truck, plaintiff had no authority or control. He occupied the position as a guest of the driver, whose negligence could not be imputed to him. Neither is the decision in the case of Stromer v. Dupont, La. App., 150 So. 32, applicable here. There, the following car was operated too closely to the forward car and at too great a speed. It was also found that the driver was not giving proper attention to the operation of his car. We recognize that the rule under which the driver of an automobile is sometimes relieved from negligence in making the wrong choice when confronted with a sudden emergency cannot be successfully invoked by one who had a part in creating the emergency himself or where he contributed to it, McCook v. Rebecca-Fabacher, Inc., La.App., 10 So.2d 512, and though he did not contribute to its creation, he nevertheless could have avoided it, Independent Oil Refining Co. v. Lueders, 17 La.App. 154, 134 So. 418. Under the facts of the instant case, these authorities are without application.
Plaintiff cites in support of his position two cases, Reeves v. Caillouett, La. App., 46 So.2d 373, and McNeely v. United States Fidelity & Guaranty Co., La.App., 69 So.2d 600, the pertinency of which to the instant case is questioned by defendants. In the Reeves case recovery was allowed against the driver of a truck which passed an automobile on a straight segment of highway and then came to a sudden stop, presenting an emergency to the driver of the automobile just passed. The automobile was traveling approximately 40 miles an hour, the truck at approximately 60 miles per hour. The impact of the collision of the automobile with the truck occurred at a point 800 feet beyond the passing position. The truck came to a sudden stop, as aforesaid, on a straight section of highway without any apparent reason for such stoppage. The court held that, since the truck passed the automobile at a speed of 20 miles an hour in excess of the speed of the automobile, the driver of the automobile had a right to expect that the truck was not going to stop within 700 or 800 feet after it passed him. While the driver of the following vehicle is required to remain at a reasonable distance from a forward car, the driver of the following car can anticipate a reasonable observance of the rules of the road by the driver of the car ahead of him. We think such a holding is applicable to the facts of the instant case. The facts reveal a situation here much stronger, in our opinion, in plaintiff's favor. For instance, the speed of the vehicles in the instant case was *196 only approximately one-half that of the vehicles in the cited case. Too, the distance traveled by the Cadillac after passing and before stopping in front of the truck was only a fraction of the distance the passing vehicle traveled before stopping in the cited case.
In the McNeely case, two vehicles driven by two 14 or 15 year old girls were parked in front of a residence at Colfax, Louisiana, and the drivers were in agreement that they would drive westerly, one following the other in going to another residence on the same street, which was a right of way street by municipal ordinance. The cars were parked only 95 feet east of the intersection of Sixth Street. The first driver proceeded through the 95 foot distance to Sixth Street, with the second vehicle following closely in the rear. Both drivers knew they were on a right of way street and both knew where they were going, and there was no reason to believe that a stop would suddenly be made before crossing Sixth Street. On approaching this intersection, the driver of the first vehicle saw a vehicle driven by another friend approaching in the opposite direction and this driver, suddenly and without warning, stopped her car a few feet from Sixth Street to determine whether or not the friend would make a turn at that intersection. Because of such sudden stop, the driver of the following car was unable to stop in time to avoid a collision, although she applied her brakes but too late to avoid the accident. All of this happened within a space of approximately 90 feet and neither car could have been traveling fast. It was held that the driver of the forward car was negligent in creating an emergency constituting a proximate cause of the accident. It was a circumstance where a following car had only a short distance in which to prevent a collision caused by the sudden stopping of the forward car.
In the instant case, at the speed which was within the legal limits provided for both vehicles, the forward car stopped as aforesaid in the right-hand lane after proceeding, according to the testimony, about 90 feet beyond the end of the bridge after passing the truck about the middle of the bridge. There was some testimony to the effect that the truck was at approximately the end of the bridge when the Cadillac stopped. Such would appear consistent with the speed of the vehicles and the distances traveled.
Finally, in bar of plaintiff's right to recover, defendants plead that plaintiff was guilty of independent negligence and of independent contributory negligence in these respects, (1) that the vehicle was operated at an excessive and dangerous rate of speed to which plaintiff made no protest, and that plaintiff knew of the presence of the cattle and of the approach of the oncoming car when his own driver attempted to make a passing movement in the oncoming car's lane of traffic; (2) in failing to maintain a proper lookout and to warn or protest to Cason of the dangers ahead on said highway; (3) in failing to warn or protest to Cason of the approach of the southbound vehicle and of the presence of the cattle on or near the highway at the time the passing of the Cadillac was attempted, and (4) in failing to ascertain whether the operation of the truck could be made with safety to other persons lawfully using and occupying the highway at that point. Defendants' plea is based upon plaintiff's admission that as they approached the south end of the river bridge he saw a few head of cattle on the right-hand shoulder of the highway north of the bridge and also, coming in the distance from the north, another automobile, and out of whom counsel obtained an affirmative answer to the question "And you thought `now, there is possible danger up there with those cattle grazing right there by the side of the road'?" and from plaintiff's answers given in the following excerpt taken from his testimony:
"Q. Going down that hill in a fast truck was dangerous itself, wasn't it? A. Going down a hill with a loaded truck is dangerous through a little community like that anyhow.
"Q. And he had a very heavily loaded truck that he knew wasn't easily controlled, I presume? A. Yeah, he knew it wasn't easy.

*197 "Q. And you knew it, didn't you? Is that correct, sir? A. I knew it wasn't easy controlled."
We cannot attach the importance or significance to these statements as contended for by defendants. There is always a remote possibility or likelihood of a danger being encountered when cattle are seen grazing on the shoulder of a highway, either with or without the approach of another vehicle in the opposite direction, and generally there is danger driving at a fast rate of speed a heavily loaded truck down-grade and through a small community. There was no admission that the truck was traveling at a fast or excessive rate of speed, but, as heretofore stated, the truck, as well as the automobile, was being operated within the limits prescribed by law.
The evidence conclusively shows there was no occasion for Dickson to protest to, or warn, the driver, who was a trained and experienced operator, or to warn him of the presence of the cattle on the shoulder or the approach of an oncoming vehicle when their truck was proceeding at a reasonable rate of speed and no emergency had then been created or arisen. The law does not contemplate that when a driver observes cattle on the shoulder of a highway that he shall come to a stop when he first makes that observation, neither does it require that he proceed at a speed less than reasonable, as would have been driven under the circumstances by a prudent operator. The emergency was created by the sudden passing of the truck by the Cadillac, which immediately was steered to its right-hand lane of traffic only a short distance ahead of the truck and in its lane of traffic, and suddenly slowed or stopped, without the giving of any notice or warning, making it impossible for the truck to stop in its lane of traffic before striking the forward car. That occurrence was so sudden, so unexpected and so uncalled for as to prevent any reasonable person from anticipating such occurrence. The truck driver hardly had sufficient time to think, and on the spur of the moment suddenly swerved the truck to the left and passed the Cadillac in an attempt to avoid a collision. While plaintiff realized that the truck and trailer were in trouble from the time that the Cadillac stopped in front of them, he stated, in answer to a question as to what he knew Cason could have done other than what he did do to avoid the danger:
"A. I don't know of anything in the world that could have been done or shouldn't be appreciated more than Mr. Cason the way that he carried out his driving."
In further explanation of plaintiff's knowledge of the conditions ahead, to the following question:
"Q. Now, when you saw the car coming Northexcuse me, from the north to the south there and the cows grazing by the edge of the road I imagine you realized that that was presenting a danger and a peril down there, didn't you?"
he answered:
"A. Well, at the speed that we was traveling and at the speed that he was traveling and the cows wasn't on the road there was no danger for us at that time. Of course, we was slowing * * * the reason there was no danger we was slowing down for this cross road as Mr. Cason has drove through there several times and he knows where that community is and I'm sure that he always slows down through that community."
While in our opinion, after the emergency was created, there was insufficient time or opportunity for plaintiff to protest, had Cason's operation of the truck warranted such protest, in the following excerpt from his testimony plaintiff expressed plausible reasons for not making an outcry:
"Q. Did you ever say anything to him at all about getting his car under control or watching the cattle or watching the approaching car or watching the Cadillac? A. No, I didn't, for the reason why, Mr. Cason has always been a reliable driver, he's always abided the *198 traffic laws and he's always showed his self fair courtesy to obeying the rules that the Highway Department lays out and at this time I felt like that anything I said might have caused him to do something wrong, he might have hit his brakes and went ahead on and tried to stop and rammed into the back of the car and throwed the trailer in the front of this other one or just anything like that and I feel that that's the reason that I don't believe I told him anything.
"Q. In other words, you had just rather take your chances on the dangers developing up ahead of you than say anything at all? A. I'd rather take my chances on not messing him up and causing him to do something or other that wouldn't be right than I would to for me to tell him something that would cause him to do something wrong. That was the chance I believe I was taking and that's what I'm trying to say.
"Q. So you knew what the dangers were but you simply decided as a personal choice not to warn him of those dangers or protest to him or give him any knowledge of it at all? A. I felt like what I said might have caused him to do something wrong in his driving."
Pertinent to the issues here is the following extract from the opinion of the Supreme Court in the case of White v. State Farm Mut. Auto. Ins. Co., 222 La. 994, 64 So.2d 245, 249-250, 42 A.L.R.2d 338:
"Contributory negligence is, as the phrase signifies, negligence which contributes to the accident, that is, negligence having causal connection with it and but for which the accident would not have occurred. Insofar as the rights of a guest in an automobile are concerned, it is settled that, in actions against third persons, the negligence of the host driver does not bar recovery because his negligence cannot be imputed to the guest. Lawrason v. Richard, 172 La. 696, 135 So. 29; Lorance v. Smith, 173 La. 883, 138 So. 871. However, a guest may be denied recovery on the ground of contributory negligence in instances where he is guilty on his own part of independent negligence of such a nature, that, but for which, his injuries would not have been sustained. Lorance v. Smith, supra; Churchill v. Texas & Pac. Ry. Co., 151 La. 726, 92 So. 314; Delaune v. Breaux, 174 La. 43, 139 So. 753; Squyres v. Baldwin, 191 La. 249, 185 So. 14. But in determining whether the asserted fault of a guest has been a contributing factor in bringing about his injuries, it is first necessary to ascertain what duties are imposed upon him as pertain to the operation of the vehicle and the safety of the journey. It is firmly established by the above cited authorities of this Court and others of the Courts of Appeal of this State, too numerous to mention, that a guest is under no duty to supervise the driving of the vehicle and he is not obliged to look out for sudden or unexpected dangers that may arise. Albeit, he has the right to place reliance upon the driver to discharge that obligation and, as aptly expressed by the Court of Appeal, Second Circuit, in Singley v. Thomas, 49 So.2d 465, 469, `* * * is not required to monitor the operation or to pay attention to the road and other traffic conditions' in the absence of a showing that he has actual or constructive knowledge that the driver is incompetent or unfit to operate the vehicle.
"On the other hand, the jurisprudence has imposed upon the guest an obligation to avoid an accident or injury to himself under certain conditions. That duty has been tersely said by this Court, in Delaune v. Breaux, supra, to exist in cases where the guest `* * * is aware of the fact that there is danger ahead, which apparently is unknown to the driver or may be unknown to him, or where a sudden or unexpected danger arises to the knowledge of the guest, apparently not observed by the driver * * *.' 174 La.

*199 at page 47, 139 So. at page 755. In such situations, it is incumbent on the guest to warn the driver of the danger and, if he fails to do so at a time when the driver is able to avert it, his dereliction may be said to be a contributing cause of any injury he may sustain.
"In addition to these instances of contributory negligence, recovery of a guest may be refused when he has knowingly assumed a particular risk, such as riding with an intoxicated driver or one otherwise incompetent. This doctrine of assumption of risk has sometimes been applied indiscriminately by the courts as contributory negligence. James, Assumption of Risk, 61 Yale L.J. 141 (1952)."
Applying the foregoing principles of law to the facts herein presented, we experience considerable difficulty in discerning the alleged contributory negligence of plaintiff. It is not shown that he was aware of any facts indicating there was danger ahead, which facts were unknown to, or may have been unknown to, the driver of the truck. The driver had slowed down on his approach to the bridge and to the highway crossing and prior to entering the unincorporated village of Monette's Ferry, and, as stated, neither a sudden emergency arose nor a sudden or unexpected danger existed until the Cadillac, as aforesaid, passed the truck and stopped in its lane of traffic immediately ahead, which fact was equally and as quickly observed by the driver as by plaintiff. Plaintiff was entitled to place reasonable reliance on the driver to discharge the obligation of being vigilant for the appearance of sudden or unexpected dangers. The speed of the truck was reasonable and had no possible connection with the accident; and the driver was not guilty of recklessness in its operation. No events so foreshadowed that an accident was impending as to place upon plaintiff a duty to protest. The conclusion is, therefore, inescapable that plaintiff was free of the charges of negligence made against him.
Defendants next complain of the alleged erroneous charges and instructions given to the jury by the trial court at the request of plaintiff's counsel. The first complaint relates to the charge reading:
"It is the law of Louisiana, and one of the rules of the road, that the driver of a vehicle shall not, under any circumstances, overtake or pass another vehicle proceeding in the same direction at any intersection of the highway."
This charge contains a proper statement of the law as contained in LSA-R.S. 32:233, paragraph E. It was within the province of the jury to determine from the evidence whether the passing was at the intersection and, if so, whether such fact had any causal connection with the accident.
Further objections were made to Charges VII and VIII, which read as follows:
"Charge VII. In this case, if you find the driver of the Cadillac was guilty of any negligence, no matter how slight, that was a contributing proximate cause of the accident, then judgment should be rendered against him and his employer for appropriate damages.
"Charge VIII. If you find the driver of both vehicles negligent and that their joint negligence proximately caused the accident, you should give judgment against both. This is true even though you find one driver guilty of great negligence and the other guilty of only very slight negligence." (Emphasis supplied.)
The objections were predicated on the contention that the charges constituted an improper statement of the law in ruling out any determination of proximate or intervening cause. We do not so construe the charges. The objection was evidently made in error of the exact wording of the charges, for we note in counsel's brief from his quotation of the charges that the words "proximate" and "proximately", as emphasized hereinabove, were omitted from his quotation.
*200 There could have been no confusion or misunderstanding of the jury as to these charges or as to plaintiff's burden to establish, by a preponderance of the evidence, negligence on the part of the defendants proximately causing the accident. Under special charges requested by defendants, the jury was thoroughly instructed as to proximate and intervening cause, and the jury's attention was directed in plaintiff's special requested charges in five instances that, before a verdict could be rendered in his favor, the jury must find that the negligence of the driver of the Cadillac must have been a proximate cause or a proximate contributing cause of the accident.
Nevertheless, under the constitutional authority of this court to review both the evidence and the law, we have made such review and find that no reversible or prejudicial error has been shown by the giving of these instructions.
The matter of the quantum of damages is the final issue for determination. As in many cases of this character, plaintiff insists the award was inadequate, whereas the defendants contend the award is excessive. On the extent of plaintiff's injuries, disability, pain and suffering only three witnesses testified, Dr. Ford J. McPherson, an orthopedic surgeon, and plaintiff and his wife. No evidence on this phase of the case was offered by the defendant.
Plaintiff at the time of the accident was a young man 27 years of age, married and supporting, by his labor, his wife and four children ranging in age from two to six years. His average earnings were approximately $55 per week. In the wreck, plaintiff was thrown from the truck, with the timbers falling on him. In about an hour and a half, he was conveyed by ambulance to a hospital in Natchitoches, where he was first seen by a physician and administered aid. Later, during the night he was transferred by ambulance to a Shreveport hospital, where sedatives were administered and he was put to sleep about midnight. On the following day an operation was performed by Dr. McPherson, under whose care and treatment plaintiff remained until August 12, 1955, or for more than 14 months. The doctor's opinion was that within six months following his release on said date plaintiff would probably be able to return to manual labor.
In the accident, plaintiff's right arm was broken into three pieces. In the course of the operation the small piece was attached to one of the other segments by means of metal screws and the whole was spanned with a metal plate. On that first of six occasions, plaintiff was hospitalized for a period of eight days, during which he, no doubt, suffered immensely, having remained conscious from the time of his injury until sedatives were administered about midnight of the day of the accident. During several months following the accident plaintiff got little rest or sleep. His arm continued to pain him and the pain grew progressively worse, reaching a throbbing state, when plaintiff was "walking the floor with pain". Inflammation and infection set in and the wound finally burst open and pus released therefrom.
His condition is perhaps better described by Dr. McPherson, who testified that he first saw plaintiff on the night of June 8, 1954, when he was admitted to the North Louisiana Sanitarium by a transfer and referral by Dr. Preston Ferguson of Natchitoches, and when, from the history of the case, he learned that plaintiff had been injured in a truck accident during the afternoon, whereby he had sustained a fracture of the humerus or arm bone between the shoulder and the elbow. This bone was broken into several pieces, and on the following day an open operation was performed, after a general anesthesia was administered, by opening the skin and spanning all the way down through the muscles to the bone, exposing the broken bone, after which the pieces were put together with the aid of seven screws and a metal bone plate. Plaintiff remained in the hospital until June 13 and then was permitted to return home, after which, with reference to the infection, the doctor stated:

*201 "Unfortunately, probably one of the worst things that can happen in bone surgery regardless of who does it and I did this one, this man developed a wound infection. There are many reasons for wound infections and it is almost impossible to say specifically what it might be but in the final analysis germs get into the depth of the wound and infect it. They can get in through the skin during the course of the operation or through the air or from our breathing through the masks but regardless they get in and set up an infection, and when they do the infection goes all around this metal and makes it loosen up and then the metal acts as a foreign body and in this man's case that's exactly what happened, plus the fact that it destroys the natural healing process of the bone * * * the soft tender hemorrage that consolidates and finally heals the bone is destroyed and the early callus that heals is destroyed and in this instance the extra pieces of bone were also destroyed * * * the fragments, the little pieces. So he was readmitted to the hospital because of this infection on the 3rd of August, 1954, and at that time he had rather a gross evidence of infection so that the metal was removed again by surgical operation * * * on the 22nd of September,"
and to the question:
"Q. In other words, you operated on him and put this metal in his arm and then you went back and operated on him to take it out?"
he replied:
"A. That's right. We left it in as long as it looked like it was holding well enough, as long * * * in the face of infection with metal the metal doesn't like the infection and the infection doesn't like the metal so we try to pick an opportune time in which we feel that the metal has held as long as it's doing any good and then it's in the way and just keeping the infection up. On the 22nd of September we thought that we had reached that point and operated on him again * * * opened him up through the same incision. Of course, in the meantime he had been draining pus through there and in the meantime he had loosened up one of his screws and spit it out in the pus himself, so that he saved us the work of taking one screw out, he did it himself. The metal was removed as well as two large pieces of dead bone. The wound was closed and two days later when he had recovered he was set up and placed in a spica cast."
The cast referred to covered and enveloped his body from his waist line to his armpit under his left arm and included his right shoulder and his entire right arm and part of his hand. That part of the cast covering the arm was supported in an upright position by a segment extending from the body cast to the elbow. The testimony shows that plaintiff was in two casts, one of which was reworked and readjusted, altogether, for a period of 156 to 165 days. The last cast was removed May 10, 1955. The first cast remained for a period of two months when it was removed and the arm placed in a sling. Approximately one month later a fracture appeared through the callus formation at the site of the original fractures. Whereupon, he was again admitted to the hospital and another cast applied on February 2, 1955, which remained until March 28, when it was reworked and readjusted. Plaintiff continued to wear this one until May 10, 1955. Following said date, plaintiff was allowed to begin exercises supervised by a physiotherapist and was seen by the doctor at frequent intervals, until August 12, 1955, when he was discharged by the doctor, who said plaintiff at that time was relatively comfortable and had fairly good motion at his shoulder and elbow, but a definite shortening of one-half an inch in his arm due to the loss of the bone. As to his disability the doctor stated:
"The disability estimated on this man was approximately thirty five per cent of the extremity at the shoulder with the anticipation that it would improve in the next six months from August *202 and that he would wind up with about a twenty five per cent permanent partial disability of the extremity at the shoulder due to the shortening and the rotation, neither of one will improve. We thought that he would have about a ten per cent improvement due to increased motion at the shoulder and elbow that should improve with time."
In explaining the percentage basis of plaintiff's disability the doctor stated:
"That if this man were to attempt to do everything that the rest of his body would be capable of doing that is to say all jobs there would be, say twenty five per cent of them that he couldn't do and that if you put him on any specific job there would be about twenty five per cent of that job that he couldn't do and he would be a seventy five per cent good paper hanger and he'd be about a seventy five per cent good prospect on the open labor market. He would be able to take about seventy five per cent of all available jobs and no matter which one he took he would only be able to do about seventy five per cent efficiently, that is, of all things that may be required."
With particular reference to plaintiff's injuries, the doctor concluded:
"Well, I think every layman can appreciate a broken right arm in a man who earns his living by being a laborer and that his immediate response is that `I may be crippled for life', which, of course, is our job to stop them from being, and we try to reassure them that they won't be, but there is an immediate fear that arises in the laboring man who breaks his right arm. Of course, no man likes the thought of having his arm opened up by a big incision and metal put in. They usually get over that fairly well when they find out it's nice and solid and it should have healed in six to eight weeks. However, this man became infected, he had pain and fever and then it burst open and drained pus and he had bandages and pus and pain and smell and he bore with it until we took his metal out months later and then he wore these uncomfortable casts with drainage under the cast and these casts were winded and the dressings were changed. Just when he looked like he was well again he fractured through the callus and had to go back through the whole process again and he had another episode in which the infection flared up and he also went through the anticipation of our recommendation that he would be operated on again and a bone graft done on him, which fortunately we didn't do. He flared the infection which made us hold off and nature came to his rescue and healed him anyway but it did take long conservative treatment in plaster to accomplish it."
Plaintiff was hospitalized on six occasions during a period of 14 months, during which it is shown that he suffered extreme, ex cruciating pain, and it can be safely concluded that he has sustained a degree of permanent total disability and that he will not hereafter be able to perform all the duties of any work which he was formerly qualified to do and that, necessarily, his ability to secure and keep employment has been diminished on that account.
Defendants have cited authorities in support of their view as to the award made in this case. On account of the many distinguishing differences in the cases cited from the present, we deem it unnecessary to refer to or dwell at length upon them other than to state that, in our view, they are inapposite here, other than the case of Benson v. Metropolitan Casualty Insurance Co. of New York, La.App., 79 So.2d 345, wherein plaintiff, a young man 25 years of age, sustained a similar injury to his right arm. Benson did not develop the complications as experienced by plaintiff here and the extent and duration of his pain and suffering were not near so great. In that case, we held that the award of $10,000 made by the district court was not excessive. We did not pass upon its adequacy from plaintiff's viewpoint inasmuch as the award was the maximum contractual limit of defendant's liability.
*203 Although the injuries were different, the extent and duration of plaintiff's pain and suffering and disability are very similar to that experienced by the plaintiff in Reeves v. State, La.App., 80 So.2d 206, wherein this court increased an award by $5,000 to $20,457. Taking into consideration the substantial hospital and medical expenses, the considerable loss of wages sustained and the prolonged period of suffering and recovery from the effects of the injuries sustained, as well as the permanent disability from which, the doctor testified, plaintiff would not recover, we conclude that the award is not excessive. On the other hand, our review and appreciation of all the facts of this case have not convinced us that the award is inadequate; it is our conclusion that the award is in all probability adequate.
For the reasons hereinabove assigned, the judgment appealed is affirmed at appellants' cost.
Affirmed.
GLADNEY, Judge (dissenting).
I respectfully dissent from the views expressed in the majority opinion of this Court for I am convinced negligence of Frazier, driver of the Cadillac automobile, has not been proven.
In stating this opinion, for the sake of brevity, I shall confine the discussion to a consideration of two questions which I think are determinative of the case. These are; first, did the Cadillac abruptly and suddenly stop directly in front of the heavily loaded truck and trailer driven by Cason and thereby confront the latter with a sudden emergency which caused the truck to overturn only after it had passed the Cadillac and proceeded more than 400 feet farther along a good and level highway? and, second, was the accident due to a cause or causes unrelated to any conduct of the driver of the Cadillac automobile?
Manifestly, if the evidence establishes with certainty that Frazier brought the automobile to a normal stop to avoid striking a calf which crossed into the path of his car, Cason was not thereby confronted with a sudden emergency due to the maneuver of the Cadillac, and thus there could be no legal basis for assessing damages against appellants.
A great preponderance of the evidence shows the Cadillac automobile did not create the sudden emergency testified to only by Dickson and Cason. Seven other witnesses, some of whom were entirely without interest, completely destroy this testimony of the two employees of the Department of Highways. These seven witnesses were the five occupants of the Cadillac and Lewis and Metcalf, occupants of the southbound automobile which met and passed the highway truck and trailer about 100 feet after the latter vehicle had passed the Cadillac car.
Lewis and Metcalf were in an excellent position to observe and did observe the events developing in front of them. Lewis testified he observed the Cadillac when it came off of the north end of the bridge at which time the truck and trailer driven by Cason were 150 to 200 yards to the rear of the Cadillac. He said the stopping movement of the Cadillac was an easy stop and said further:
"It came to a stop or nearly to a stop, right in the northbound traffic lane and it did not hit any cattle * * *."
Metcalf testified that the Cadillac automobile, because of the cows, slowed real slow or stopped and the truck came on around it into the left side of the road. In Metcalf's statement produced at the time of trial was the following:
"At the time I noticed the Cadillac coming to a stop, or slowing in order that two cows might cross the highway from east to west in front of the Cadillac."
Nancy Anne Stearns testified the Cadillac made a slow, gradual stop. Linda Trusty said it was a very slow stop,"I mean it wasn't abrupt or anything, just gradually pulled off the road and stopped." Miss Annie Whalen testified she saw the cattle on the road and that the Peters automobile came to a slow stop and she testified:
*204 "Q. Tell me what you saw, Miss Whalen, if you will. A. We were going along and we noticed the cows before we got there. We pulled off the road and stopped and then the truck came on the road and when it saw the cows, it turned on the left hand side and went down on the side of the road and got down and itthe front of the car jerked away from the other, and I got out of the car and went over there."
Mrs. Estella Peters stated that her car was brought to "just a normal stop like you would at any other time."
David Frazier testified he slowed down and came to a normal stop.
I submit, therefore, that the weight of the evidence is against the unsupported testimony of Cason and plaintiff. What then did cause the truck to turn over and injure plaintiff? The record strongly indicates several factors worthy of serious consideration. These are: the speed of the truck, inattention of the driver, and the untimely loosening of the chain which bound the heavy bridge timbers to the bed of the trailer.
Cason and Dickson gave the speed of the track and trailer as less than 30 miles per hour when it passed the stopped Cadillac. It is undisputed the truck turned over at a point more than 500 feet north of the bridge and because it traveled this distance, Trooper Byrd in his official report reported the speed of the truck and trailer as 45 miles per hour. Lewis and Frazier gave this same estimation. Other witnesses testified the truck was traveling fast.
Whether Cason was keeping a proper lookout as he drove the truck across the bridge is an issue prompted by an admission he did not observe the Metcalf vehicle until he began to pass the Cadillac. Cason further testified he did not apply his brakes after passing the Cadillac. Except for some cause preventing application of the brakes, the heavily loaded vehicle traveling at a speed of about 30 miles per hour should easily have been stopped within 400 feet. Why the brakes were not used may well be answered by evidence which strongly suggests the turning over of the truck was due to the shifting of the load on the truck.
The truck was a 1951 International truck and trailer unit and was loaded with creosoted lumber stacked between bolsters and fastened by chains. The record does not disclose the length of the truck-trailer unit, nor the weight thereof.
Metcalf, an occupant of the southbound vehicle, in a written statement, related:
"At this time I noticed a Cadillac coming to a stop or slowing in order that two cows might cross the highway from the east to west in front of the Cadillac."
And then, he stated:
"Suddenly I heard screeching of tires on the highway."
Dickson, the plaintiff, in describing the journey taken by the truck after Cason passed around the Cadillac, said:
"He (Cason) was coming down the left side of the highway somewhere in there. I couldn't say whether we was off of the highway or not. We was coming on the left side here; we had pulled over to get around this car here and I couldn't say for sure whether we was off of the highway all the way down here or not, but from this store onto where we turned over I know we was. It was sloped in front of that store there and I can remember the truck begin to catch on the tires and make all different cuts like that and then it went on up here close to this colored fellow's house somewhere in here."
Dickson further testified:
"Q. Now, did I understand you to say that in the excitement of that wreck you could feel the load on that trailer did you say going up and down and humping on the tires? A. That's when it got over on the side I could feel it throwing the load over on the bolsters and they would chain on the tires and would turn loose like that.

*205 "Q. The tires would turn loose? A. No, the load would shift back and loosen up on the tires and it would go a little piece and catch again.
"Q. As a matter of fact, that truck and trailer were in trouble for that whole distance, weren't they? A. Yes, sir, that truck and trailer were in trouble from the time that this woman stopped in front of us until we come to a sudden stop down there with the wreck."
Miss Annie Whalen when asked to describe just what she saw as the truck went out of control down the road, testified:
"Well, we saw the car going down the road; it was the pressure of the pipeit had pipe on the back and he could guide it but he couldn't stop it because the back force was tooit was pushing it, it was rolling."
David Frazier likewise testified he heard screeching of the wheels, saying:
"A. Well, it sounded like it was making noise with its tires, you know, was squeaking on it or something. I don't know if they were or not; I couldn't be sure.
"Q. That was when it was going over into the left lane of the highway? A. Yes, sir, it was already in the left lane."
Finally, Amille Antoine, who lived within a few feet of where the truck turned over, testified concerning the truck:
"A. I saw when itwhen the back end of it come loose. I was sitting down, looking, with my foots up this way on the post. I saw it when it first donewhen it first donewhen that back chain broke loosecome unfastened and the lumber was stacked up that way and the back chain come loose and I saw the lumber on the back end of the truck when it just spread out that way, and I never did get up off of my seat.
"Q. Did it turn over on its side or just what happened to it? A. It turned overthe lumber just bust open and it turned right over on its side just a little inside of that post. I never moved because after I seen it open up I didn't get scared and didn't bother."
Plaintiff has failed to prove with legal certainty actionable negligence, in which the fault of David Frazier can be considered a proximate cause of the accident. This is shown by testimony of sufficient weight to prove that a sudden emergency was not created to confront Cason by the stopping maneuver of Frazier. In my opinion, the verdict and judgment from which appealed should be reversed and plaintiffs' suit dismissed as to appellants.
Rehearing denied; GLADNEY, J., dissenting.