ELLIS, Judge.
The plaintiffs, Mr. and Mrs. Ernest J. Olivier, were invited to take a trip during the latter part of July, 1948 as guests of the defendants, Roy Stanley Baldwin and his wife, in the latter’s automobile, which invitation was accepted and the two couiples, after a two weeks trip, were returning to their homes in Lake Charles on July 31, 1948 when, at approximately 4:30 P.M., the automobile in which they were riding became involved in a collision with an automobile owned and driven by a Mr. Capps and traveling in the opposite or easterly direction toward the city of Baton Rouge, and as a result, the plaintiff, Ernest J. Olivier, was painfully and seriously injured and his wife, Mrs. Myrtle Fisher Olivier, suffered minor injuries, for which injuries they have sued their host, Roy Stanley Baldwin, driver of the car, and his insurer.
Plaintiffs alleged that the accident was caused by the negligence of Baldwin in the operation of his car in that he was traveling at an excessive rate of speed and that he lost control of his car so that it went off on the north shoulder of the United States Highway #190 when Baldwin suddenly caused it to proceed in a southwesterly direction across the north lane of traffic and into the south lane of said highway which at that time was being traveled and occu *807 pied by a Pontiac automobile belonging to said Capps.
Defendant denied any negligence and alleged that the Capps automobile pulled into his lane of traffic a short distance in front of defendant’s automobile thereby creating an emergency, and he was, therefore, free from any negligence and not liable to the plaintiffs for their injuries.
The District Court rendered judgment in favor of the plaintiffs from which the defendants have appealed, and the plaintiffs have answered the appeal asking that the award be increased.
The main question to be decided is one of fact as to whether an emergency confronted the defendant Baldwin which he did not create nor assist in creating. It is Baldwin’s contention that the Capps automobile suddenly pulled into his, the north, lane of traffic in order to pass an automobile, while the plaintiffs contend that Baldwin was driving too fast on a wet road and lost control of his car so that at least the right rear wheel went off the edge of the pavement onto the shoulder, and that Baldwin, in attempting to get the car back upon the pavement, negligently pulled across the north lane of traffic into the south lane of traffic and struck the Capps automobile.
The doctrine of emergency is well recognized and settled in our law and needs no citation of authorities. It is stated substantively in American Jurisprudence, Vol. 5, Sec. 171, Pg. 600, and in Vol. 60, Corpus Juris Secundum, Motor Vehicles, § 257, page 624 as follows: “Where the operator of a motor vehicle is by a sudden emergency, not caused in whole or in part by him, placed in a position of imminent peril to himself or to another, without sufficient time in which to determine with certainty the best course to pursue, he is not held to the same coolness, accuracy of judgment, or degree of care as is required of him under ordinary circumstances, or of one having ample opportunity for the full exercise of judgment, and is not liable for injuries caused by his vehicle if an accident occurs, provided he exercises ordinary or reasonable care or prudence, considering the stress of the circumstances, to avoid an accident, * * * »
Also, in Vol. 60 of Corpus Juris Secun-dum, Motor Vehicles, § 257-B, page 628, dealing with what constitutes emergency, we find the following:
“In order for the emergency doctrine, as set forth supra subdivision a of this section, to apply, it must be clear that an emergency existed. If the driver has an opportunity to exercise his deliberate judgment between alternate courses to pursue, no emergency arises in legal contemplation, and the emergency doctrine ordinarily applies only when the evidence discloses that alternative action is possible and that quick judgment is required; likewise, there must be an unforeseen circumstance or an unexpected happening or a hazard which could not reasonably be anticipated. On the other hand, if the driver is suddenly confronted ¡by the unexpected operation of some natural force, or by the innocent or wrongful act of a third person, the emergency doctrine applies; and, without express reference to emergency, drivers have been held not liable where their only proved fault is inability to avoid a collision under circumstances which are unusual and not likely to be anticipated.”
“Where there is ample time and space to avoid an accident, the sudden emergency rule does not apply.”
The District Court held that Baldwin was not confronted with an emergency and that the accident and resulting injuries to the plaintiffs were caused by his “excessive speed and the too forceful application of the brakes by Baldwin when he first saw the Capps automobile which caused his automobile to swerve and the rear wheel to' leave the pavement. It was Baldwin’s continued attempt to drive the rear wheel back upon the pavement that caused his automobile to enter the south lane of traffic and hit the Capps car as it did.”
There is no conflict in the testimony of the eye witnesses, that is, Mr. and Mrs. Baldwin and Mrs. Olivier, Mr. Olivier being asleep at the time, that the Capps’ Pontiac automobile which was traveling toward Baton Rouge and thus meeting defendant’s car, pulled out of its south lane well into' the north lane of traffic and traveled therein in an apparent attempt to oass the car in front of it. The ■distance Detween the Capps car *808 and the defendant’s car at the time the former left its south lane of traffic and entered the defendant's north lane of traffic.is somewhat in conflict. Mr. Baldwin, in a statement which he gave the day-after the-accident, placed the distance at 150 feet, but on the trial of the case pointed out an object in the court room which the Judge estimated to be approximately eighty feet. Mrs. Olivier estimated the distance on the trial of the case at 250 feet, however, this estimate is in direct conflict with statements which she made prior to the trial and which will be discussed more in detail.
The testimony of Baldwin, the defendant and driver of the automobile, consisted of that given- on the trial and also of a statement dated August 1, 1948 made to Steve Alford, Jr.,. an attorney-at-law of Baton Rouge, Louisiana, who at that time was employed as an -adjuster by an independent adjusting company and which he reduced to writing and Baldwin apparently signed. This statement is substantially in accord with Baldwin’s testimony, and the pertinent portion thereof is as follows:
“At the time of the -accident we were en-route from Baton Rouge to Lake Charles. We were proceeding at about 45 to 50 M.P.H. on the right hand side of the highway. There was a rather heavy line of eastbound traffic approaching us -and the driver of the Pontiac pulled out of this line directly in front of tne in my lane of traffic. The other car was about 150 feet away from me coming so fast that there was absolutely nothing I could do to avoid the collision. I couldn’t say how fast the other car was going at the time of the accident meeting it head on as I was.”
“It was not raining at the time of the collision but had stopped only a short time before and the highway was still wet. When I realized that there was to be an accident, I put my brakes on very hard which caused the rear end to swing around a short distance to the north putting my car at an angle to the highway and the other automobile which was completely in my 1-ane struck my right front side, spun me around, glanced off and continued on into the ditch on the south side of the highway.”
Mrs. Baldwin testified that immediately prior to the accident she had been eating a peach, and that as she threw the peeling out of the car her husband applied the brakes and she looked up and saw the Capps car “directly in front, of us coming toward us,” and at that time the Baldwin car was on the right side of the highway. She did not fix the distance for she stated she had no sense of judgment as to distance, but she positively testified that the Capps car, when the brakes were applied by her husband and she looked up, was very close and in Baldwin’s lane of travel, and the next thing she knew the collision was over and she was getting up off the pavement. She further testified, which is denied, that Mrs. Olivier stated at the scene of the accident that it was not Mr. Baldwin’s fault, and repeatedly thereafter told her the same thing. Mrs. Baldwin when pressed on cross examination, estimated the speed of defendant’s car at 45 to 50 miles per hour.
Mrs. Olivier testified th-at it had been raining just prior to the collision and that Baldwin was driving his car at approximately 65 or 70 miles per hour, and that .she was sitting- so that her vision was unobstructed to the front, -and just prior to- the accident she saw several cars coming toward them, traveling in the opposite, or south, lane of traffic, and then she saw the Capps car come out of the traffic into- the north lane in order to p-ass the car or. cars in front of it, and she estimated the distance of the Capps car at the time it came into- the north lane as probably 250 feet. She further stated that the Capps car completed its return to the south traffic lane when the two cars were approximately thirty feet apart, and it is, therefore, her contention that it was not necessary for Baldwin to -apply his brakes. She did admit that when the Capps car cut out into the north lane that that was when Baldwin applied his brakes and the oar went out of control and into the south lane of traffic and struck the Capps automobile.
In contrast to- Mrs. Olivier’s testimony given on the trial, we have her statement dated August 9, 1948 taken by Mr. Steve Alford, Jr., and signed by Mrs. Olivier, which definitely .establishes the fact that *809 Baldwin was confronted with an emergency. The pertinent part of the statement is as follows: “I was seated on the back seat of Mr. Baldwins 1947 Frazer with Mrs. Baldwin and my husband was seated on the front seat with Mr. Baldwin. We were proceeding west on the right side of U. S. Highway 190 just east of Lottie, La., at about 45 to 50 M.P.H. when the automobile we were in collision with broke out of the line of eastbound traffic directly ahead of Mr. Baldwin so close that it was apparent that there was nothing Mr. Baldwin could do to avoid the collision. He applied the brakes immediately to avoid the 'full impact of a headon collision and the car began to skid so that at the actual moment of impact the front end was at a slight angle to the left. The other automobile driver appeared to be trying to g'et back into his lane of traffic and as he crossed the black line the front left side of the other vehicle struck the front right side of Mr. Baldwin’s car turning it completely around so that after the accident the Baldwin car was headed in an easterly direction. The Capp automobile continued on into the ditch at the south side of the highway.”
This witness attempted to explain the difference in the statement and her testimony by saying that she was so tired on the day it was taken and that she did not want to give a statement and was somewhat forced into it. The testimony shows that she gave the statement freely and willingly and that she understood, although she attempted to deny it, the full meaning of the statement, in fact, she read the statement over, made some corrections in it and initialed the corrections. ■ This explanation is purely an after-thought which is the result of the plaintiffs having been informed that Capps had no insurance and it then dawned upon them to go after Baldwin and his insurer. It is shown by the testimony that this was not the only time Mrs. Olivier told the story of the accident in practically the same language and to the same effect as was given to Mr. Alford and which is contained in the written statement signed by her.
Mr. Olivier is the uncle of Miss Elsie May Whitman, an attorney-at-law of Lake Charles, Louisiana, who in the beginning was interested in the case or in assisting in any way. The testimony shows that there was company in Olivier’s room when she spoke to her aunt before contacting Alford and she then wrote Alford of her findings. We have in the record a letter dated August 9, 1948 written 'by Miss Whitman to Mr. Alford, the adjuster, in which she stated the following: “Mrs. Olivier is positive in her recollection of the fact that a black car came out of the line of opposing traffic only a few feet in front of them and struck their car. Mr. Olivier’s memory was not clear, but perhaps by the time you see him it will have cleared up. In talking with Mrs. Baldwin this morning, she is also positive in her identification of the car which came out on to the north side of the center line right in front of their car, and colliding with their car on the north side of the road, turning their car around and .on to the south side of the road.”
A mere reading of Miss Whitman’s testimony will show that there is no doubt but that Mrs. Olivier had talked freely to her with regard to the accident. She testified in part as follows:
“Q. Didn’t you understand that Mrs. Olivier told you specifically the facts, that the car — be it black or not — pulled out of the line of traffic directly in front of the Baldwin oar a few feet away? A. I remember that someone said that there was a car that came out of a line of traffic which was going in the opposite direction from theirs.
“Q. And you said that you think that that someone was probably Mrs. Olivier? A. It was probably Mrs. Olivier because she was the only witness that I know of that was there.
“Q. And you do not recall the statement that it was only a few feet in front of the Baldwin car when it came out of the line of traffic directly in front of the Baldwin car? A. I don’t recall that exactly. I wouldn’t be able to testify to that.
“Q. How far away do you recall she ■ said it was? A. Well, it was evidently dangerously near. I don’t know how many feet or what would be considered dangerously near but it was evidently enough to create a situation.
*810 “Q. Shall we say an emergency? A. Well, I don’t know whether it was an emergency or not, but anyway, a dangerous situation.”
It is very apparent that Miss Whitman gained the impression from the story of the accident as told to her by Mrs. Olivier that an emergency was created.
Mr. Olivier signed a short statement on August 9, 1948 in which he told Mr. Alford that the statement of his wife, Myrtle Fisher Olivier, which had been read to him contained true facts as stated therein to- the best of his knowledge. Mr. Olivier testified that he did not remember the signing of the statement or Mr. Alford being in the room, in fact, he remembered nothing about that statement of the case. However, Dr. Bannerman came into the room at the time Mr. Alford was there, and in his deposition he stated that Mr. Olivier appeared to be rational. Mr. Alford testified that he knew Mr. Olivier was suffering and' that he did not try to obtain a statement from him, but that they had a coherent conversation and Mr. Olivier told him that he knew his father as he had painted his portrait.
Mr. Olivier’s testimony on the trial of the case was to the effect that he was asleep and was awakened by the bumping of the car and a 'scream by Mrs. Baldwin. The first thing he sáw was Baldwin “fighting the wheel, pulling it to- the left.” This witness estimated the speed of the Baldwin vehicle at the time that he awoke and at the time .of impact at approximately 45 or 50 miles per hour. He testified that he never did see the oncoming automobile. This, to us, is proof that the collision took place almost immediately after he awoke. The application of the brakes and the collision must have been within a fraction of a second. This witness talked to Mr. Baldwin sometime after the wreck on -o-r about August 18th or 19th, 1948, and pertaining to this conversation he testified as follows:
“Q. Did Mr. Baldwin ever mention that the cause of the accident was this car driven by Capps pulling out directly in front of him in his lane? Did he ever- mention that to you? A. He said that caused him to put the brakes on, that is-what he said, and he admitted that he put the brakes on so- hard that his car got to skidding and went off the road and when he did come back on the road he pulled over and went right on into his lane of traffic. That is the way he explained it to me.”

"Q. And after the accident had been explained to- you by Mr. Baldwin and in the presence of Mrs. Olivier, who- confirmed, did she not, his version? Did she not always at all times confirm the fact that Capps pulled out and caused him to put the brakes on ? A. I think that was the cause of the whole thing. It looks that way.
“Q. I asked you if Mrs. Olivier, in your presence and in the presence of .Mr. Baldwin, did not at all times confirm that Capps pulled out and that caused Mr. Baldwin to-put the brakes on ? Did not she at all times confirm that? A. That is what I understand, yes. That is what caused him to- lose control of his car.”
There was a person named Montgomery who lived adjacent to- and immediately south of Highway 190 close to the scene of this -accident, and who was on a step ladder picking butterb-eans about 300 feet away at the time he heard the impact. He looked up and saw the Baldwin car in the south lane of traffic and the Pontiac, Capps' car, was off the shoulder -of the highway. Also, when he looked up he saw a lady rolling across the concrete toward the south side of the highway and saw no other car east of the Baldwin car but did notice a car that was following the Pontiac or Capps car and which applied its brakes very suddenly in order to avoid running over the lady who rolled out of the Baldwin car. It is not shown which lady this was as both Mrs. Baldwin and Mrs. Olivier were thrown from the rear seat of the automobile and came to rest on the south shoulder near the edge of the pavement. He saw no- other vehicle proceeding in an easterly direction, however, it is shown that his vision to the east was obstructed and only clear for a distance of 50 to 75 -feet. It is established that there were two cars preceding the Capps car and at the time of the collision this witness’s attention was drawn to the lady rolling across the pavement and the two automobiles involved in the wreck and *811 he did not notice either of the two cars or they had already passed his line of vision.
The main damage to' the Baldwin car was to the right front, mainly the fender and a portion of the radiator to within six or eight inches of the center line. The damage to the Pontiac or Capps car occurred on the left front fender or left front portion of the car. From this we are of the opinion that these two cars came together when each was at an angle. In fact, it would appear from all the testimony that the Baldwin car was skidding with its front end facing in a southwesterly direction and the rear end in a northeasterly direction, and that the Capps car was attempting to turn hack into the south lane of traffic and its 'front end was headed in a southeasterly direction with its rear in a northwesterly direction. We do not believe that the Capps car was back in the south lane of traffic and headed in a straight line at the time of the collision as the District Judge seemed to think. This is somewhat beside the point for it makes no difference what position the Baldwin car was in at the time of the collision if such position was due to the emergency which confronted him. However, the damage to the cars is important in that it would tend to prove that it was proceeding from the north lane into the south lane at the time of the collision and would, therefore, he proof that it had pulled out into the north lane of traffic.
The Lower Court did not discuss in any detail whatsoever the testimony of the eye witnesses on the theory that their testimony was conflicting and the physical facts were better evidence and told the story of the collision. After the accident occurred, the State Troopers were notified and two came to the scene of the wreck, one of whom did the investigating while the other directed traffic. While the Trooper who made the investigation testified from his report, it is not in evidence, and from reading his testimony it appears that he did not have too much independent recollection of the facts contained in the report. In other words, he depended clearly upon the report, yet he testified to statements which were not in the report which Baldwin is supposed to have made to him with regard to the accident. This Trooper testified that Baldwin told him the cause of the accident was the fact that when he applied his brakes he lost control of his car on account of the highway being wet. This Trooper further stated that Baldwin told him “He saw the car (Capps) when it nosed out from behind the other vehicle but he didn’t recall the exact distance.” There is no explanation of what is meant by “nosing but” or what the District Court meant by the term as that was his conclusion, but we take it that he meant that Capps slowly pulled the front of his car out toward the north lane of traffic to see if the way was clear. We believe the Capps car came into the north lane of traffic and traveled therein for some distance, and at the time of the collision was attempting to return to its proper lane of travel. It is true that debris, mud and glass from the wreck was found in the south lane near the south edge of the pavement, and that the personal effects of the occupants of the Baldwin car, some of .which were in the trunk and others in the left hand side of the rear of the car just to the left of Mrs. Olivier were strewn all over the highway or the south portion thereof, and that the two ladies, as stated, came to rest on the shoulder on the south edge of the pavement and to the west or rear of the Baldwin car, and Mr. Olivier was some 40 feet in front of the Baldwin car with his head on the south shoulder and the rest of his body on the pavement. The positions of the ladies is rather easy to understand, as well as that of the luggage, for the Pontiac car shoved the Baldwin car in a semi-circle facing to the east. The fact that the glass, mud, and so-called debris was located as described was taken by the District Court as the point of impact. This is impossible, due to the fact that these two automobiles when they struck on the right and left front fenders respectively were at an angle and there is no testimony that the front end of the Baldwin car was knocked around off the pavement on the south shoulder in its turn to the east, nor is there any contention or testimony that the right portion of the Capps car was off of the pavement and on the south shoulder of the highway at the moment of impact, both of which would have had too be true for *812 the collision to' have occurred at the south edge of the south lane where the glass was found. In our opinion these two cars came together at an angle as described, more than likely in the south lane of traffic close to the middle line, and this glass and mud was thrown in the direction that the force of the cars took them which would be to the south and east. This mud and glass rolled in the same manner as did the ladies.
Taking all the testimony relevant to the creation of an emergency, it is our opinion that the plaintiff has not borne the burden of proof by a preponderance of the evidence. The preponderance of the evidence is to the effect that the Capps car was traveling behind two' other cars in an easterly direction and pulled out into the north lane of traffic in front of the Baldwin automobile at such a close distance as to create an emergency within the legal and actual meanirig of that term. Taking either of the distances given by Baldwin of 80 to ISO feet, there is no doubt that two' cars traveling at a combined speed of 100 miles per hour would meet within one second. Such a situation would be deemed an emergency. Even if we take the distance most favorable to the plaintiffs of 250 feet at the time the Capps car pulled into the north lane in an attempt to pass one or both of the cars in front of it at a speed which could not have been less than that of the Baldwin car for the very simple reason that the force of the blow by the Capps car knocked the Baldwin car completely back around facing in an easterly direction and would, seemingly, be greater that that of the Baldwin car which is fairly well established at 50' miles per hour, Baldwin had, therefore, less than two seconds to do something in an attempt to avoid the collision. Under this statement of facts an emergency was created. Baldwin’s action under the stress of circumstances was reasonable. He applied his brakes, and even if Mrs. Olivier’s testimony rather that her statement should be correct in that she noticed the Capps car back in the south lane a distance of approximately 30 feet from the Baldwin car a moment prior to the accident, if he had gotten completely back in the south lane of traffic, the fact that Baldwin applied his brakes probably prevented a collision in the north lane of traffic. Nevertheless, one could not say that an emergency had not been created by the Capps automobile even under this state of facts. One could only reason that a head-on collision in the north lane of traffic, which more than likely would have involved the two passing automobiles, had been averted by the application of the brakes on the Baldwin car, which of necessity slowed its speed. There is no doubt that when the emergency was created he applied his brakes as soon as possible, and the rear of his car veered to the north, and taking the Trooper’s testimony and that of the driver of the wrecker, this caused the rear right wheel to go off the north edge of the pavement onto the shoulder, and he released his brakes and his car was then traveling at an angle. He reapplied his brakes with full force, and the testimony of these two witnesses is to the effect that the track of the right rear wheel which was off of the concrete on the shoulder became choppy for several feet, and that the right rear wheel then swung back onto the pavement and made a track in the nature of an arc which was visible to the point where the Baldwin car came to rest facing in an easterly direction in the south lane of traffic.
It was testified that after the accident traffic used the shoulder and the north lane in order to pass the wreck, and that the bus almost became stuck on the shoulder near the scene of the accident. The Troopers and the wrecker service man did not arrive until approximately one and a half hours after the wreck, which would throw some doubt upon the question as to whether the track they described as coming off of the pavement east of the point of impact was that of Baldwin’s car. Baldwin denied that his car got off the pavement. Taking their testimony as true it is immaterial under the law whether Baldwin’s car skidded by reason of the fact that he applied his brakes on the wet road, as he was faced with an emergency.
We do not believe that Baldwin’s speed of 45 to 50 miles per hour just prior to the collision was excessive under the circumstances. Although it is true it had *813 rained, it was daylight and the highway was straight with an 18 to 20 foot concrete slab.
Our conclusion is that Capps pulled well into the north lane of travel and travelled therein to pass the car immediately ahead of him. When he perceived that there were two cars ahead of him, he then attempted to regain his right side. At the .same time the two automobiles of Capps .and Baldwin were rapidly approaching each other and it is that situation which caused Baldwin to first apply his brakes, and when his car swerved to the left, he released his brakes and then, perceiving the closeness of 'Capps’ car, reapplied his brakes “flooring” them. It was clearly an emergency of which he had no part in the making.
For the above reasons, the judgment of •the District Court is hereby reversed and .the plaintiffs’ suit dismissed at their cost.