102 So.2d 532 (1958)
Adolph M. BOURGEOIS, For and on Behalf of his Minor Daughter, Delaine Bourgeois, and Mrs. Adolph M. Bourgeois,
v.
FIDELITY & CASUALTY CO. OF NEW YORK and The TRADERS & GENERAL INSURANCE CO.
No. 4612.
Court of Appeal of Louisiana, First Circuit.
April 21, 1958.
Rehearing Denied May 26, 1958.
*533 Boswell, Loeb & Livaudais, New Orleans, for Traders & General Ins. Co.
Christovich & Kearney, New Orleans, for Fidelity & Cas. Co. of N.Y.
A. Deutsche O'Neal, Kenneth Watkins, Houma, for appellees.
ELLIS, Judge.
This is a suit for personal injuries brought by Adolph M. Bourgeois upon behalf of his minor child. A party plaintiff is Mrs. Adolph M. Bourgeois. The defendants are the Fidelity & Casualty Co. of New York, insurer of Adolph Bourgeois, and The Traders and General Insurance Co., insurer of Warren J. Pontiff. Bourgeois and Pontiff were the owners and drivers of two vehicles which were involved in an accident, from which this suit arose. Mrs. Bourgeois and the minor were passengers in the Bourgeois automobile.
The lower court rendered judgment in favor of Adolph Bourgeois for the use and benefit of his minor child in the sum of $15,000, the total amount prayed for, which is the total of the applicable limits of insurance policies covering both vehicles. Judgment was further given in favor of Mrs. Adolph M. Bourgeois in the sum of $1,500 in solido, against both insurers. Both defendants have appealed and Mrs. Bourgeois has answered the appeals, seeking an increase in the amount awarded to her.
This accident occurred at about 7:00 A.M., when Bourgeois, accompanied by his wife and minor daughter, was driving his car in a southerly direction upon a road which was topped with gravel, rocks and shell. Pontiff was driving along the same highway in a northerly direction. The Bourgeois car was traveling at 35 to 40 miles per hour and the Pontiff vehicle was approaching at about 45 miles an hour, when the two cars were approximately 400 feet apart. At that time the Bourgeois vehicle entered the left hand lane of traffic and then crossed back into its proper lane. Bourgeois did not re-enter Pontiff's lane of traffic until the cars were about 200 feet to 250 feet apart. According to the testimony of Bourgeois he lost control of his car due to loose gravel, and although he tried to straighten his car out and return to the right lane, he stated he could not do so. He said he did not see Pontiff's *534 car until Pontiff was 75 to 100 feet away from him. It is apparent that he lost control of his car, pulled back into the right lane of traffic, and not having full control of the car, applied his brakes and skidded into the left hand lane in which Pontiff was traveling. This skid resulted in the Bourgeois car sliding into a small ditch. A summation of his testimony shows he lost control of the car when he was driving at the speed of about 35 miles per hour, ran head on into the Pontiff car, and finally ended up with his left wheels in the ditch, and Pontiff's testimony evidences that he did see the Bourgeois car about 400 feet away from him when Bourgeois first entered his lane; that Bourgeois then crossed back into his proper lane of traffic, then back into the left lane when they were about 200 to 250 feet apart. Pontiff then took his foot off the gas and when the Bourgeois vehicle started sliding sideways he applied his brakes. When Pontiff stopped accelerating his car the Bourgeois vehicle headed toward him in his lane of traffic, and according to Pontiff, he started applying his brakes when he was about 50 feet away from the Bourgeois car. He stated positively that he did not realize Bourgeois was not going to pull out of his lane of traffic until he was about 50 feet from him. The record shows that when Pontiff was traveling about 45 miles an hour and Bourgeois 35, the distance between the cars was approximately 250 feet, and at that time the Bourgeois car did not start to slide, but shortly thereafter, or some distance less than 250 feet, the Bourgeois vehicle was clearly out of control. At these speeds the vehicles were approaching each other at the rate of 80 miles an hour or 117 feet per second, and while the record does not divulge the exact distance between the two vehicles when that of Bourgeois started to slide, it can be concluded correctly that this distance was less than 250 feet. At this distance Pontiff had approximately two seconds in which to decide what to do. According to 14 Tulane Law Review 493, 503, and authorities cited, the reaction time of an average driver is three-fourths of one second. Consequently Pontiff was left a very short time in which to make up his mind as to what he should or could do. Under such circumstances the district court concluded Pontiff was guilty of negligence which contributed to the accident. The lower court was of the opinion that this driver could have done more than he did and should have done something to avoid the accident. Our learned Brother below concluded Pontiff saw the difficulty which the Bourgeois vehicle was in soon enough to avoid the accident and that he had the last clear chance to do so.
We agree with the lower court in its finding that the original negligence of Bourgeois was the primary cause of the situation which gave rise to the accident. The trial court, in written reasons for judgment, stated:
"This is an ordinary bayou road that twists and turns with the contour of the bayou. There were ruts in the road and they were clearly visible and admittedly seen by Mr. Bourgeois. There is no pretense in this record that the accident was caused other than by Mr. Bourgeois losing control in the loose gravel."
As we said in Chouest v. Remont, La.App., 81 So.2d 568, 570, "The really serious question at issue is whether, as the able and learned District Court found, * * * had the last clear chance to avoid the accident, even though the initial negligence of * * * actually produced the perilous situation which eventuated in this accident."
In the same case, 81 So.2d at page 570, is found:
"Whether or not the oncoming driver observing the other car executing an unusual maneuver in his path and on its wrong side of the highway has the last clear chance of avoiding the accident is normally a question of fact, depending on whether the oncoming *535 driver did or should have observed that the other driver had created or was creating a dangerous situation; and whether after such time, the oncoming driver could have avoided the accident in question, but nevertheless failed to do so, Rottman v. Beverly, 183 La. 947, 165 So. 153; Jackson v. Cook, 189 La. 860, 181 So. 195; Russo v. Texas and Pacific Railroad Co., 189 La. 1042, 181 So. 485; Cassar v. Mansfield Lumber Co., 215 La. 533, 41 So.2d 209."
In the Chouest case, supra, we did not disturb the finding of facts by the lower court that the driver of an approaching vehicle noted the excessive speed of another approaching vehicle in its lane and continued an imprudent approach. We considered the argument of counsel, saying:
"In such event, as urged by Farrell's insurer, the trier of fact might have concluded that the sole proximate cause of the accident was Mrs. Remont's driving on the wrong side of the road, and that Farrell was not negligent in assuming that the driver approaching him on the wrong side of the road would observe the law and would not remain in Farrell's lane on her wrong side of the road, Womack v. Doyle, La.App., 40 So.2d 825; Manget Bros. v. Henry, 13 La.App. 57, 127 So. 51; Goodson v. Schuster's Wholesale Produce Co., Inc., 10 La.App. 486, 120 So. 689, or was unable to avoid the accident by reason of errors of judgment within a sudden emergency created a few seconds before the accident by Mrs. Remont's negligent entry onto his side of the road, Lee v. Kastner, La.App., 69 So.2d 137; Olivier v. Baldwin, La.App., 1 Cir., 48 So.2d 806; Crawford v. Zurich General Accident & Liability Ins. Co., La.App., 42 So.2d 553."
However, in the Chouest case, the approaching driver observed the hazard some 600 feet away, whereas in the case at bar, we conclude the true hazard was not created until Pontiff was only some 250 feet from the Bourgeois vehicle and at a time which was too late to avoid the accident. A sudden emergency was created to which he did not contribute. In Cook v. Dance, La.App., 96 So.2d 350, 353, we find:
"When a driver of a motor vehicle is confronted with a sudden emergency not of his own making and to which he did not contribute, he cannot be held responsible or liable for errors of judgment committed by him in the emergency where he is compelled to act instantly in an effort to avoid an impending accident. In such circumstances he may not be said to be guilty of negligence if he makes such a choice as a person of ordinary prudence would have made even though it appear later that he did not make the wisest choice. He is not held to the same coolness, accuracy of judgment or degree of care that is required of him under ordinary circumstances and is not liable for injuries caused by his vehicle if an accident occurs under the stress of such emergency, provided he was exercising ordinary, prudent and reasonable care to avoid the accident. Snodgrass v. Centanni, 1956, 229 La. 915, 87 So.2d 127; Commercial Standard Insurance Company v. Johnson, 1955, 228 La. 273, 82 So.2d 8; Troy v. Lanclos, La.App.1955, 85 So.2d 70."
We recognized the doctrine expressed in the Cook case, supra, in Fornea v. Crain, La.App., 79 So.2d 95, 97.
"We further feel that while possibly Fornea may have avoided the accident by turning left around defendant's car instead of attempting to turn right, under the well recognized sudden emergency doctrine, plaintiff cannot be held responsible for his misjudgment in reacting to the sudden emergency created by the negligence of defendant."
Also see Marler v. State, La.App., 78 So.2d 26; Tyler v. Marquette Casualty Company, *536 La.App., 79 So.2d 376; Exner v. Flowers, La.App., 82 So.2d 47; Dickson v. Peters, La.App., 87 So.2d 187.
It seems the only way Pontiff could have avoided the accident was to have taken some steps to stop his automobile or drive it off the road when he first saw the Bourgeois car some 400 feet away. The record indicates at that time he had no reason to believe the Bourgeois car was not under control or that it would not turn again into its right lane and allow him to pass. Bourgeois knew the condition of the road and he should have driven so that at all times he would have his vehicle under proper control. See Davis v. Lewis & Lewis, 226 La. 1064, 78 So.2d 174.
We conclude the trial court erred in holding the liability insurer of Pontiff, Traders and General Insurance Co., liable, and that the sole proximate cause of the collision was the negligence of Bourgeois, for which his insurer, Fidelity & Casualty Co. of New York, is liable.

Quantum
The injuries and resulting disability to the Bourgeois minor, including a review of the evidence, are well covered by the lower court in its written reasons for judgment.
"Delaine Bourgeois is a young child. Her claim was limited to the limits of the two policies, as it had to be. The outlook of this child is not too promising. She suffered a brain injury which is permanent. She suffered a skull fracture and brain injury resulting in a right hemiplegia, which virtually means a complete paralysis of the right side of her body, including the right arm and right leg. She overcame a part of her affliction, and is now able to walk with proper braces. Painful exercises were and are required to build the limbs of the child sufficiently to provide the natural therapy required for any type of recovery for the child. She will continue to wear the brace on her right leg. The brace is a cumbersome, unattractive attachment connected with the child's foot going up to her knee. The child did have fits which she never had prior to this accident. These have subsided and possibly may never recurr again.
"There is not any doubt that the child's condition was caused by the accident. Dr. H. Theodore Simon treated the child. His testimony begins on transcript page 26. It is lengthy and given in considerable detail.
"When first seen by Dr. Simon, her condition was diagnosed as `a spastic paralysis involving the right half of the body'. It involved the upper and right lower extremity. The upper extremity showed some definite evidence of flexion tendency of the fingers, of the thumb and the wrist (Tr. 28). The foot was turned in a marked position and in a state of twisted deformity (Tr. 28). A shoe correction was used which gave some effective result. The condition of the foot was attributed by Dr. Simon to the accident (Tr. 30). The epileptic seizures were attributed to the accident (Tr. 31). The doctor refused to state what the future of the child would be on these epileptic seizures, thus strongly indicating that there was some future serious trouble that could be anticipated (Tr. 31). On page 32 of the transcript Dr. Simon testifies:
"`I would state that the child is walking better, but I think the eventual would be an operative procedure by me or anyone else that knows what to operate on, and that then the child will be helped.'
"The Doctor testified that without the operative procedure there was little, if any, possibility of ever doing without the brace (Tr. 32). And even with the operative procedure, a full recovery should not be anticipated (Tr. 33).

*537 "The Doctor does not have a good outlook for the child, as is strongly indicated in the following language on page 34 of the transcript:
"`Q. Under even good results, then you anticipate the necessity of seeing this child for many years in the future? A. That's correct.'
"The Doctor recommended a neurectomy, which means a cutting of the nerve (Tr. 35), but Dr. Karr indicates that he would not use any operative procedure (Tr. 53 & 55), he would prefer to take his chances with nature.
"This is a very seriously injured child. She cannot anticipate too much recovery without operative procedures, and there is a serious doubt apparently among the medical profession that even serious operative procedures would be of use.
"This child was examined for her brain injuries by physicians for one of the defendant insurance companies. As a result of this examination, the child's scalp was badly burned and stayed extremely sore for several months, causing a great deal of pain and discomfort, not only to the child but to her worried parents. This was just one of the many hardships suffered by the child as well as her parents.
"While Dr. Karr did not have ample opportunity to view the child sufficiently to arrive at a decision concerning the permancy, extent or total severity of the child's injuries (Tr. 50) he was satisfied that the condition of the child was attributed to the accident (Tr. 51 & 52). Dr. Karr also testified that the plantar reversal (or `babinski sign') was present, and that in plain English this means that the big toe turns up and there is a fanning of the small toes, and that this is brought about by brain injury or brain tumor or spinal cord tumor (Tr. 52). Dr. Karr also would not go all the way with Dr. Simon on the child having a right hemiplegia, because this indicates a complete paralysis, whereas Dr. Karr would prefer to call it a `right monoparesis' which is not a complete paralysis but is a weakness (Tr. 53).
"Dr. Karr says `it is a hope' that the child would improve, but he refused to say that `there was a likelihood' that the child would improve (Tr. 56). And the Doctor stated that an injury in the `right occipitoearietal region' could have resulted in the condition of the child (Tr. 57), which, incidentally, is the region of the head where this child received a blow. Dr. Karr felt that it is `unlikely' that the child's condition was brought about by any preexisting condition (Tr. 58 & 59).
"Dr. Allen Ellender, Jr. originally treated the child and followed her through. He testified how the child was injured on the left side part of the brain which controls, generally speaking, the right side of the body. And he stated `There was some injury there but we later attributed everything to the damage to the central nervous system' (Tr. 85). And finally, Dr. Ellender is of the opinion that the particular condition of the child is more in the field of orthopedic surgery than in any other particular field (Tr. 99), thus indicating that Dr. Simon's field is the proper one for the child.
"Dr. Randolph Page testified for one of the insurance companies. He had to accept the history of the case as given to him. He felt that undoubtedly the baby had sustained a brain injury at the time of the accident. She was suffering with a `dropped foot' at the time that he saw her, and though it would likely improve he said `* * * *538 It would be impossible to predict how much it would improve, * * *' (Tr. 108).
"Dr. Page stated under cross examination that if the child were brought to the hospital from the accident with a complete paralysis of the right arm and right leg which had never been noticeable prior to the accident, that the conclusion would be that the child's condition was caused by the accident (Tr. 114). This hypothetical question is consonant to the testimony of Dr. Ellender and of the several neighbors who testified as to the condition of the child prior to the accident. Therefore, the effect of Dr. Page's testimony is that the child's present condition was caused by this accident (Tr. 114).
"Dr. Page, at the request of plaintiff counsel, examined the child during a short recess (Tr. 115), and concluded that the brace then being worn by the child was needed. He also observed that there was a `slight' improvement in the child since his examination of October 17, 1955 (The Doctor was testifying on April 4, 1956).
"The following language of Dr. Page is pertinent (bottom of Tr. 116 and continuing to Tr. 117):
"* * * I don't think that we are sensible about returning completely. I don't think anybody is talking about that. The baby has an injury. We can't talk about complete normality, but from a functional point of view, well, I think that if you just say that in a few years, with consistent, reasonable attention to the problem, you will get a substantial recovery. That is it.
"Q. Then we are not going to say that complete normalcy will ever be reached, are we? A. I don't see how you can.'
"The Doctor refused to indulge in estimating the number of years that it would take for the child to return to what he called normal function. He even refused to speculate, which makes this Court believe that in the mind of Dr. Page this was a serious and prolonged condition. The pertinent testimony is as follows (Tr. 117):
"Q. You have used the phraseology `a few years'. This is open to argument. Would you expect this child to return to the point where she will have normal function of that foot, the right foot, by the time she is 25 say? A. I don't know. I think that is silly. There is no way to be sure."
The district Judge expressed the opinion the "policy limits of both insurance companies is not sufficient to adequately take care of the damages to this child." The policy limit of the Fidelity & Casualty Co. of New York is $10,000 as to any one injury and consequently a judgment in favor of the minor child cannot exceed this amount. Considering the injuries sustained and the resulting disabilities, an award for $10,000 to Delaine Bourgeois is more than justified.
Mrs. Bourgeois suffered injuries to her right arm. While she was never hospitalized she was still complaining of pain in her arm at the time of the trial and her testimony is not contradicted that it swells and that three of her fingers on her right hand occasionally get numb. After the accident her arm was put in a splint, where it remained for more than a month. The district court, upon the basis of expert testimony, believed her complaints to be genuine and that pain persisted even at the time of the trial, which was some two years after the accident. The award of $1,500 will be affirmed.
The expert fees, assessed as costs, are in line and we see no reason to disturb them.
For the reasons hereinabove, the judgment of the district court is reversed insofar *539 as the Traders & General Insurance Co. is concerned, and plaintiffs suit is dismissed at their cost against the Traders & General Insurance Company. The judgment is amended to assess damages against Fidelity & Casualty Co. of New York in the amount of $10,000 for and on behalf of the minor, Delaine Bourgeois, and in all other respects the judgment is affirmed at the cost of the appellant, Fidelity & Casualty Co. of New York.