GLADNEY, Judge.
Elton P. Salter and his wife, Jewel Salter, instituted this tort action against Acme Well Point Corporation and its automobile insurer, Travelers Insurance Company, for damages for the total property loss of their Ford automobile, and for personal injuries sustained by both plaintiffs. Following a trial wherein charges and counter charges of negligence were made judgment was rendered adverse to the plaintiffs who have lodged this appeal. This suit was consolidated with a companion suit entitled Acme Well Point Corporation v. Salter, 116 So.2d 358, for the purpose of trial and appeal, and accordingly, a separate judgment therein follows this decree.
The accident from which this litigation arises occurred about 10:50 o’clock on the morning of November 16, 1957, on U. S. Plighway No. 165, approximately one quarter of a mile south of the intersection of the Sterlington and Bastrop highways, at which point the highway makes a wide, gradual curve but runs generally north and south. Prior to the accident Elton P. Salter, accompanied by his wife who was sitting on the front seat, was driving south in a Ford sedan in the direction of Monroe. When he arrived at the intersection above mentioned, he stopped for the purpose of permitting a vehicle to cross in front of him and then proceeded toward the scene of the accident. At the time it was drizzling rain, the highway was wet, and he was traveling at a speed of from forty to forty-five miles per hour when he came to the locale of the collision. A truck belong *353 ing to Acme Well Point Corporation and driven by Leonard Hope, who was alone, was moving northerly behind a Pontiac automobile driven by Mrs. Bonnie Ward, whose companion was Mrs. Charles Cummings. Hope also approached the scene of the accident simultaneously with the approach of Salter. The resulting collision between the Salter automobile and the truck occurred while all of the three named vehicles were passing a strip of pavement over which water occasioned by excessive rains on that morning was crossing the highway and running in a westerly direction. This water was estimated to cover about seventy-five feet of the pavement, and was stated to be several inches in depth. The collision took place within the water covered area of the pavement. The Salter vehicle, after impact, came to rest eighty-five feet south of the indicated point of collision off of the highway on the west side thereof. The truck was found to be headed in a northwesterly direction, forming with the highway an angle of forty to forty-five degrees. Its front end protruded over into the southbound traffic lane two or three feet. Salter and his wife were immediately taken to the Bastrop Hospital. After the Salters were gone State Trooper Casey L. Anding arrived upon the scene and made an investigation.
The record leaves no room to doubt the cause of the accident was the negligence of either Salter or Hope. The theory for recovery advanced by appellants is that Hope was following too closely the Ward automobile, that he did not make timely and proper observation of the approach of the Salter car, and further, that he negligently turned his vehicle to the left into the southbound traffic lane before he observed the proximity of the Salter car. The theory of the defendants is that Salter was guilty of negligence in driving into a water-covered portion of the pavement at an excessive rate of speed, and as a consequence thereof he lost control of his vehicle which crossed over into the east lane or northbound traffic lane of the highway and precipitated the collision. Pleading alternatively, counsel for the contending litigants have filed pleas of contributory negligence. After considering the contentions so made, in relation to the evidence, the district judge in his reasons for judgment, affixing fault upon plaintiffs, stated:
“In the Court’s opinion the accident was caused by the negligence of Mr. Salter in driving into the water without first slowing his vehicle down to a safe rate of speed. The proximate cause of the accident was his negligence.”
The report of Trooper Anding shows that at the scene of the accident U. S. Highway No. 165 has an asphalt pavement twenty-four feet in width, with additional width of its shoulders of sixteen feet and that the highway was straight and level and the surface of the road was wet with water on the road. Actually, there is a slight curve in the highway that presents no visual or control problems to a motorist and so the report can be considered as substantially correct. Due to the water condition of the highway there was no evidence of debris or tire marks from which the exact point of impact could be determined. The trooper testified the collision inflicted damage to the left front portion of the truck and the left side of the Salter automobile to the rear of the front door. He said the Salter car was a complete loss. The record discloses the truck driven by Hope had a load capacity of 18,000 pounds with the front and back axles having a weight of over 7,000 pounds. The overall width of the truck was eight feet and the overall length was approximately twenty-one feet. The testimony shows Salter passed the vehicle driven by Mrs. Ward before it had emerged from that portion of the pavement covered by water, and that the accident immediately thereafter took place.
The first contention of plaintiffs is that Hope upon entering the water covered area, was pressing too closely and gaining upon *354 the preceding Ward vehicle which caused him to make application of his brakes and turn to the left which placed his truck in the southbound traffic lane. Testimony relative to this issue was presented by Mr. and Mrs. Salter, by Mrs Ward and by Hope. Mrs. Cummings, however, said she made no observation of the truck to the rear. Salter testified when he was approaching some several hundred yards away, he saw the Ward automobile coming from the south and the truck was right in behind the automobile. Salter testified:
“It got close up to him and looked just like the truck was pushing the car, or either the car pulling the truck.”
Mrs. Salter testified the truck was very close behind the car ánd she estimated that not over a half car length distance separated them. Mrs. Ward said she had observed the truck following her at a safe distance and when her vehicle entered the water she thought the truck was fully a length or maybe more behind her vehicle. Hope testified when the Salter car first reached the water, Mrs. Ward’s automobile lacked ten or twelve feet of emerging from the water. He was then questioned as to what distance he was back of the Ward car at that time, and said:
“Well, I was around 40 or SO feet, maybe a little closer or maybe a little further, I couldn’t say for sure.”
One of the charges of negligence against Hope is that prior to the accident he was not making proper observation or lookout for approaching traffic or, it is said, he would have seen the Salter car and not have turned his vehicle into the southbound traffic lane. Hope testified:
“Q. And when did you see the Salter car? Where was it when you first saw it? A. When it passed the car ahead of me.
“Q. You hadn’t paid any attention to it up until the time it passed the car ahead of you? A. No.”
It is not controverted that when the Salter vehicle first entered the water covered portion of the highway and while it was passing the Ward car it was being driven in its' proper lane and there was no indication it was out of control. This was attested by Mr. and Mrs. Salter. Mrs. Cummings testified the Ward car was on its right side of the road and nothing appeared that would have confused a person or would have prevented him from knowing where the center of the highway was. She said the passing of the Salter and Ward vehicles was safely made and almost immediately there was a crash. She stated when the Salter vehicle passed it was on its right side of the road and continuing straight ahead. There was no evidence showing Salter was driving across the center line or that he did not have his vehicle under complete control when it passed the Ward car.
As to the position of the truck immediately prior to the impact, testimony was given by Hope and Mr. and Mrs. Salter. Hope testified that he was driving as close to the right side of the pavement as he could get. Mr. and Mrs. Salter testified that just as they passed the Ward vehicle the truck made a movement across the center line and into the west lane of the highway.
Hope’s knowledge of the accident is reflected in his testimony, as follows :
“Q. You don’t think you moved a few more feet to the north after this collision? A. I don’t think so.
“Q. Well, you know you are bound to have done some moving or else how could you be crosswise there in the road? A. Just one of those things, when you don’t see what happened you don’t know what did happen. You get out here in a hole of water and somebody comes into it and throws water all over you, well, you don’t see what happened and you don’t know what happened.
*355 “Q. Well, I asked you a while ago if you knew what part of the road you were in when the impact came. A. I was on my part of the road the last thing I seen.
“Q. Yes, hut there was a period in there when you say your windshield was flooded and you don’t know where you were and you were still moving forward, weren’t you? A. That is correct too.”
Mr. Salter thus stated his version:
“A. Well, I saw this car coming meeting me. They was over in their lane of traffic and I was in mine. I wasn’t thinking about anything happening and just before the front of my car got with the car that I was meeting, well, I seen this truck move out from behind the car. Well, I hollered something to my wife and she hollered something to me at the same time, and I just cut my car to the ditch but by that time it was just like throwing a snowball on the windshield — it had done hit.”
Mrs. Salter testified:
“Q. When did the danger develop, Mrs. Salter? A. Well, we were passing the lead vehicle when we realized the trouble was near us.
“Q. And what did you see at that time? A. We saw that that truck was coming into us.
“Q. Now that was the truck which was following the northbound vehicle? A. Yes.
“Q. Now, at the time that you saw it was coming into you, on which side of the road was your husband driving? A. On the right side.
“Q. What did you actually see just as your vehicle was passing the first of the two northbound vehicles? A. I saw that that truck was coming into the side of us.
“Q. State whether or not it crossed the center of the highway. A. It did.”
From the evidence, considered as a whole, the salient factor which appears as the bone of contention is which of the vehicles invaded the wrong lane of travel and thus precipitated the accident. Other material facts seem to be established and others disproved by a preponderance of the evidence. Our understanding of the evidence is that Hope was following closely behind the Ward car at the time of the collision, with the intervening distance between the vehicles not less than a truck’s length to a maximum of forty or fifty feet; that Hope did not see the Salter car until it was engaged in passing the Ward vehicle; and that after the impact the front of the truck was two or three feet across the center line of the highway and did not move from the moment of the impact. Damage to the truck was inflicted over the left one-half of the front or motor assembly and left fender, and damage to the Salter automobile occurred from a point behind its left front door to the rear. Using these established facts as a base, it is our finding the locus of contact was in the southbound traffic lane and, therefore, primary negligence for the accident must be attributed to the driver of the truck.
Another issue to be considered is the question of contributory negligence of Salter in driving his vehicle at an unsafe speed; driving when his vision was obscured by water being thrown over the windshield of his car, and driving his automobile into the left or north lane due to his failure to maintain control. Salter and his wife testified that immediately before entering the water covered portion of the pavement, the Ford automobile was proceeding at a speed which they estimated at from forty to fifty miles per hour. It was drizzling rain and the windshield wipers on the car were functioning. At that time it was during daylight hours and visibility was not unusually affected. Such a speed under those conditions was not ex *356 cessive. See: Olivier v. Baldwin, La.App. 1950, 48 So.2d 806. It is not disputed a portion of the pavement was covered by water to a depth of several inches and because of this defendants charge it was negligence on the part of Salter in not observing this water and reducing his speed. Salter testified that while traveling from Farmerville the highway was wet and there were in several places on the road surface pools of water, but he did not consider any of them hazardous or dangerous to a motorist. Mrs. Ward testified that when Salter passed her automobile water splashed across her windshield and Hope gave similar testimony. The windshield of the Salter car apparently was not so splashed. From experience we know a motorist must be prepared to have his windshield splashed with water, and this not infrequently occurs. Its duration is instantaneous and windshield wipers immediately restore vision.
The remaining charges of contributory negligence are that Salter’s automobile was driven over into the northbound traffic lane and Salter failed to maintain control over the car he was driving. These charges have not been substantiated, and were disposed of by our finding the point of impact was in the southbound traffic lane. It follows therefore, that Salter was not guilty of acts of contributory negligence. This conclusion renders it unnecessary, of course, to consider the plea of contributory negligence directed at Mrs. Salter.
Mrs. Salter and her husband were seriously and painfully injured in the accident which completely wrecked their automobile. Proper evidence has been adduced in proof of special damages, amounting to $3,239.10, which total includes the following items: Medical expenses $923.60; loss of wages by Salter of $85 per week for twenty weeks, $1,700; loss of wages of Mrs. Salter from November 16, 1957, to February 12, 1958, $555; and property damage loss of automobile by reason of $50 deductible under collision coverage, $50.
The injuries of Mrs. Salter were established by the testimony of Dr. Jack L. Rawls, her attending physician, and were not disputed. Dr. Rawls summarized his findings as: shock, a laceration of the face, contusions of the left chest and shoulder, ligament tears at the costovertebral articulations of the 3rd, 4th, 5th, 6th and 7th ribs, and fractures of the 3rd and 5th ribs. Mrs. Salter remained in the hospital in Bastrop from November 16 to November 25, 1957, a period of nine days. She was under the regular treatment of Dr. Rawls until finally discharged on February 12, 1958. The doctor testified the rib fractures and liga-mentary tears caused acute pain which was exaggerated by movement in bed and by normal respiration. His treatment required sedation. The laceration across the bridge of the nose required suturing which left a scar. The evidence discloses Mrs. Salter was not able to substantially perform her household duties or her employment as a nurse until February 12th.
We have concluded that Three Thousand Five Hundred ($3,500.00) Dollars is an adequate award for the personal injuries and pain and suffering sustained by Mrs. Salter.
Mr. Salter was more seriously injured than his wife. He was hospitalized for a period of twelve days after the accident on November 16, 1957, during the first four days of which he was unconscious from a cerebral concussion. Dr. Rawls, his attending physician, testified the patient sustained severe shock, contusions of the heart and left chest wall, torn ligaments at the costovertebral articulation of the 3rd, 4th, 5th and 7th ribs, with dislocation of the 3rd and 4th ribs. In addition, he suffered a moderately severe whiplash injury to his neck. After returning to work for a short period of time, Salter was again hospitalized for a period of seven days, at which time due to pain emanating from the whiplash injury, he was placed in traction. He was able to return to work on May 4th, *357 but still continued to experience a moderate amount of pain about his chest and shoulder. Dr. Rawls testified that because of heart contusions and bruises of the chest area, the ligamentary tears and rib injuries, Salter experienced acute pain and suffered considerable discomfort for four months after the accident when the rib fractures had not completely healed. Plaintiff was still experiencing some pain as of the time of the trial on March 18, 1959, with muscular spasm still present. Dr. Faheam Cannon, an orthopedist, on an examination made on October 24, 1958, said Salter complained of radiation of pain and discomfort in his shoulder and arm, which, in his opinion, was due to a cervical nerve irritation arising from the whiplash injury. We think an award of $7,500 should be made for the personal injuries and the pain and suffering sustained, which sum along with special damages reaches a total of $10,-739.10.
By way of summary it is our holding that Leonard Hope was guilty of negligence in permitting his truck to invade the southbound traffic lane and such negligence was the sole proximate cause of the accident.
Accordingly, the judgment from which appealed is annulled, reversed, and set aside, and it is ordered there be judgment in favor of Elton P. Salter against Acme Well Point Corporation and Travelers Insurance Company, in solido, in the sum of $10,739.10, with legal interest thereon from judicial demand until paid. It is further ordered, adjudged and decreed that there be judgment in favor of Mrs. Jewel Salter against Acme Well Point Corporation and Travelers Insurance Company, in solido, in the full sum of $3,500, with legal interest from judicial demand until paid. Defendants are cast for all costs.